**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United HealthCare Insurance Co.
and AARP,

Plaintiffs,

v.

AdvancePCS,

Defendant.

Civil No. 01-2320 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

---

David B. Potter and Bret. A. Puls, Oppenheimer, Wolff & Donnelly L.L.P., Minneapolis Minnesota, and Michael J. Lyle, Christine P. Hsu, Maureen Testoni, and George J. Hazel, Weil, Gotshal & Manges, L.L.P., Washington, D.C., for Plaintiff United HealthCare Insurance Company.

Mark J. Briol and Vicki J. Bitner, Briol & Associates, P.L.L.C., Minneapolis, Minnesota, for Plaintiff AARP.

Scott G. Knudson, Briggs and Morgan, St. Paul, Minnesota, and W. Thomas McGough, Jr., Mary J. Hackett, and Christopher J. Soller, Reed Smith L.L.P., Pittsburgh, Pennsylvania, for Defendant.

---

## Introduction

Plaintiff AARP (also known as the American Association of Retired Persons) offers its members a prescription drug discount card program ("the AARP Program"). In exchange for an annual fee, AARP members receive a card that can be presented at participating pharmacies to obtain reduced prices on certain prescription medications. Defendant AdvancePCS, a pharmacy benefit management company ("PBM"), administered the AARP Program from September 1997 until September 1, 2001. As the



MAR 1 8 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

PBM, AdvancePCS negotiated volume discounts and rebates with drug companies to obtain lower prices on various prescription drugs. In addition, AdvancePCS maintained a prescription history for each participant; that is, each prescription filled at a pharmacy participating in the AARP Program was recorded and checked against the individual's other current medications to protect against potentially harmful drug interactions. If such an interaction was indicated, AdvancePCS would notify the pharmacy.

In early 2001, AARP chose Plaintiff United HealthCare Insurance Co. ("United") to assume overall operational responsibility for the AARP Program. United determined that AdvancePCS should no longer serve as the PBM for the program and contracted with Express Scripts Inc. ("ESI") to replace AdvancePCS. On September 1, 2001, the day its role as the PBM for the AARP Program ended, AdvancePCS launched its own prescription drug discount program. Many of the pharmacies that participate in the AARP Program also participate in the AdvancePCS plan.

Plaintiffs complain that AdvancePCS has diverted and processed the prescription discount claims of tens of thousands of paid AARP Program participants by surreptitiously enrolling them in the AdvancePCS discount plan without their knowledge or consent. Plaintiffs allege that AdvancePCS accomplished this by deviating from the standard practice that PBMs in the pharmacy industry follow of rejecting claims for programs that they no longer administer. Plaintiffs contend that if AdvancePCS would have simply rejected claims for AARP Program participants after September 1, the pharmacists would have been prompted to talk with their customers about the program

through which they were seeking a discount. Instead, AdvancePCS deemed any discount claims submitted under the carrier and group numbers previously used for the AARP Program to be requests for discounts under AdvancePCS's new discount program. AdvancePCS automatically "enrolled" these customers into its program and collected a fee from the pharmacy for each claim processed.

Before the Court is Plaintiffs' Motion for a Preliminary Injunction and Related Relief. Plaintiffs ask the Court to enjoin AdvancePCS from, inter alia, (1) approving claims submitted by pharmacies on behalf of AARP Program participants where those claims contain the carrier and group numbers AdvancePCS used when administering the AARP Program; (2) treating claims which contain the carrier and group numbers formerly used for the AARP Program as if those claims were intended for AdvancePCS's own prescription drug discount plan; and (3) using or retaining any identifying information concerning AARP Program participants for the purpose of soliciting them to sign up for AdvancePCS's plan. Plaintiffs also ask the Court to order AdvancePCS to turn over all customer or pharmacy information obtained as a result of AdvancePCS's diversion of AARP Program participants to its own prescription discount plan. For the reasons set forth below, the Plaintiffs' Motion will be granted.

**Background**

## I. The Parties

Plaintiff AARP is a District of Columbia nonprofit corporation having its principal place of business in Washington, D.C. (First Am. Compl. ¶ 8.) AARP has approximately 35 million members, all of whom are age 50 and over. (Id.) Currently, approximately 3.5 million AARP members participate in the AARP Program. (Hedblom Aff. ¶ 9; Simos Aff. ¶ 6.) AARP members can enroll in the AARP Program for fifteen dollars per year, and spouses of AARP members can enroll for an additional fifteen dollars. (Hedblom Aff. Ex. A (Advertisement for AARP's Member$_X$ Choice Program). In addition, AARP members who purchase certain AARP health insurance packages also can participate in the AARP Program under the name "Prescription Savings Service." (Hedblom Aff. ¶ 4; Erickson Aff. Exs. A & B.)

Plaintiff United is a Connecticut corporation with its principal place of business in Hartford, Connecticut. (First Am. Compl. ¶ 7.) In mid-April 2001, AARP selected United to assume exclusive operational responsibility for its discount drug card program. (Hedblom Aff. ¶ 10.) Prior to that decision, United had already been administering various health insurance packages offered by AARP. (Def.'s Ex. 3 (press releases).)

Defendant AdvancePCS is a Delaware corporation with its principal place of business in Irving, Texas. (First Am. Compl. ¶ 9.) AdvancePCS came into existence on October 1, 2000, as the result of Advance Paradigm's acquisition of PCS Health Systems, Inc. ("PCS"). (Simos Aff. ¶ 9.) PCS and its successor, AdvancePCS, served as the PBM

for the AARP drug discount program from September 1997 until September 1, 2001. (Id.)

## II. AARP's Prescription Drug Discount Card Program

In 1997, AARP launched the AARP Program and contracted with Retired Persons Services, Inc. ("RPS") to handle the marketing, general administration, and mail order components of the program.[1] (Feb. 6, 2002 Bessant Aff. ¶ 4.) RPS in turn contracted with AdvancePCS to serve as the PBM for the retail component of the program. (Def.'s Exs. 1 (Sept. 1, 1997 Member Choice Services Agreement) and 2 (Jan. 1, 2000 Prescription Savings Service Agreement).) RPS worked with AdvancePCS to develop the enrollment, claims, and eligibility processing system for the program, as well as training manuals to be used by pharmacists, pharmacies operated by RPS, and the RPS call center. (Simos Aff. ¶ 3.)

A PBM is responsible for, among other things, signing up pharmacies within a reasonable distance from every individual who enrolls in the program and issuing cards to those individuals for presentation at the participating pharmacies. (Simos Aff. ¶ 7; Feb. 6, 2002 Bessant Aff. ¶¶ 2, 5.) Approximately 47,000 pharmacies nationwide currently participate in the AARP Program. (Erickson Aff. ¶ 17.) Of those, over 9,600 are independent pharmacies (i.e., pharmacies that are not affiliated with a chain). (Id. ¶ 18.) These independent pharmacies represent 24% of the total claim volume submitted under

---

[1] Two years earlier, in 1995, AARP and RPS had selected AdvancePCS to pilot a "cash-card" prescription drug discount program. (Feb. 6, 2002 Bessant Aff. ¶ 3.) At that time, AdvancePCS had an existing network of more than 40,000 pharmacies nationwide. (Id.)

the AARP program. (Id.) The remaining 36,000 or more participating pharmacies are affiliated with one of the more than 200 pharmacy chains in the United States. (Id. ¶ 19.)

For each individual participating in the AARP Program, AdvancePCS assigned a "carrier number," a "group number," and an individual "identification number." (Simos Aff. ¶ 7.) The carrier number for the AARP Program was "H020" and the group numbers included 2100, 2200, 2300, 2400, and 3001-3051. (Simos Aff. ¶ 10.) The cards AdvancePCS distributed also bore (1) the AARP logo, (2) the participant's name, and (3) AdvancePCS's "bank identification number" ("BIN"). (See Hedblom Aff. Ex. A.) The BIN told the pharmacy that AdvancePCS was the PBM for the AARP Program. (Kneese Aff. ¶ 7.) When the pharmacist entered AdvancePCS's BIN into the pharmacy's database as part of the customer's profile, the computer "understood" to send claim information electronically to AdvancePCS. (Id.)

Once the AARP Program participants received their cards, they would present the card and their prescriptions at a retail pharmacy enrolled in the AdvancePCS network. (Simos Aff. ¶¶ 7, 10.) The first time a patient went to a pharmacy to have a prescription filled, the pharmacist created a "patient profile" on the pharmacy's computer database. (See Morrison Aff. ¶ 6.) The pharmacist entered information regarding the customer and his or her membership in the AARP Program, including the carrier number, group number, and individual's identification number as shown on the card. (See Hedblom Aff. ¶ 15; Simos Aff. ¶ 11; Kneese Aff. ¶ 6.) Using an electronic data transfer system, the pharmacist requested a discount on the prescription by submitting a "claim" to the PBM

for processing.[2] (Simos Aff. ¶ 7; Kneese Aff. ¶ 6.) AdvancePCS processed the claim by first checking the carrier and group numbers to ensure that claim was being submitted pursuant to a plan managed by AdvancePCS. (Simos Aff. ¶ 11; Kneese Aff. ¶ 6.) AdvancePCS next checked the individual's identification number to ensure that the person was eligible for discounts under the AARP program.[3] (Id.) Finally, AdvancePCS used the price formula assigned to the carrier and group numbers on the card to calculate the discounted price that should be charged the participant. (Id.) AdvancePCS then electronically notified the pharmacist of the price. (Id.)

AARP advertises to its members that, when a prescription is filled under the AARP Program, the individual's medications are checked for any possible problems, such as potentially harmful interactions between drugs prescribed by one or more of the member's doctors.[4] (Hedblom Aff. Ex. A.) The PBM performs this check, called a Drug Utilization Review ("DUR"), each time a participant fills a prescription at a pharmacy that participates in the AARP Program. (Simos Aff. ¶ 8.) If the DUR indicates that a

---

[2] The National Council of Prescription Drug Programs ("NCPDP") develops standards used by the pharmacy industry for electronic claims processing. (Simos Aff. ¶ 4.)

[3] Under the agreements entered into between RPS and AdvancePCS, RPS was obliged to supply AdvancePCS with enrollment and eligibility information and to update that information periodically. (Def.'s Ex. 1, ¶ 3.1.1; Def.'s Ex. 2, ¶ 3.1.1.)

[4] AARP also advertises that, under its program, participants may also be told about less expensive drug options that they can then discuss with their doctors. (Hedblom Aff. Ex. A.) Finally, AARP advertises that participating members will receive a health newsletter published exclusively for them. (Id.)

drug may be inappropriate, the PMB electronically notifies the pharmacist at the time the claim is processed.[5] (Id.)

## III. Changes in management of the AARP Program

In 2000, RPS experienced financial difficulties, and the mail order component of the AARP Program, which RPS managed directly, was struggling. (Feb. 6, 2002 Bessant Aff. ¶ 6.) Therefore, in late 2000, AARP, RPS, AdvancePCS, and United began discussing a new direction for AARP's pharmacy services.[6] (Id.) In April 2001, AARP announced that it had selected United to manage and administer AARP's pharmacy services, effective June 1, 2001.[7] (Def.'s Ex. 3 (Apr. 19, 2001 press release).) AARP

---

[5] Of the AARP Program participants whose claims were processed by ESI during September and October 2001, ESI sent DUR alerts regarding potential problems with prescriptions (including drug interactions and over-utilizations) for 227,975 participants. (Hedblom Aff. ¶ 23.) During that same two-month period, pharmacists reversed 36,751 claims as a result of alerts issued by the AARP DUR system. (Id.)

[6] At the time these discussions were taking place, United was the provider, through AARP's Health Care Options program, of health insurance products for AARP members. AARP's Health Care Options program is a source for health information, health products and services for AARP members 50 and older. (Def.'s Ex. 3.)

[7] Following the announcements, AdvancePCS wrote to RPS, stating that it had become aware that AARP had given RPS notice that it was terminating the license under which RPS had been operating the AARP Program. (Def.'s Ex. 4 (May 2, 2001 letter from AdvancePCS to RPS).) AdvancePCS stated its position that (1) the Prescription Savings Service Agreement between RPS and AdvancePCS was dependent upon RPS's administration of the AARP Program, and (2) the agreement was not assignable to United, ESI or anyone else. (Id.) Therefore, AdvancePCS stated, once the pharmacy service program had been transferred to United or ESI, AdvancePCS was under no obligation to continue providing services under the agreement. (Id.)

RPS and United later asked AdvancePCS to continue to act as the PBM for the AARP program through September 1, 2001. (Feb. 6, 2001 Bessant Aff. ¶ 8.)

further announced that United had contracted with ESI, a Saint Louis-based PBM, to handle the mail order prescription business and manage the retail pharmacy network.[8] (Id.) As a result of AARP's decision, United assumed exclusive operational responsibility for its discount card program. (Hedblom Aff. ¶ 10.)

Beginning in April 2001 and continuing throughout the next few months, ESI contacted the pharmacies then participating in the AARP Program and explained that ESI would be replacing AdvancePCS as the PBM for the program. (Erickson Aff. ¶ 5.) ESI sought and obtained contracts from approximately 98% of the pharmacies participating in the AARP Program network as administered by AdvancePCS. (Id.) On August 13, 2001, ESI sent a notice regarding the change in PBMs to approximately 47,000 AARP Program network pharmacies via "blast fax," e-mail, and U.S. Mail. (Id. ¶ 8.) In addition, on or about August 6, 2001, ESI recorded a message for its toll-free Pharmacy Help Desk line to inform callers that AdvancePCS was continuing to process AARP program discount

---

AdvancePCS agreed. (Id.) In addition, for three months after September 1, 2001, AdvancePCS gave AARP access to the prescription historics of AARP Program participants up to and through September 1, 2001. (Id.)

[8] The parties offer different explanations for why ESI was chosen to replace AdvancePCS as the PBM for AARP's prescription discount program. Plaintiffs aver that United conducted a competitive review process, and determined that AdvancePCS's bid to continue to service the AARP program was not competitive. (Hedblom Aff. ¶ 10.) AdvancePCS asserts that United chose to drop it as the PBM because it would not agree to United's demand for a larger share of the revenue, which would have cut AdvancePCS's profits. (Feb. 6, 2002 Bessant Aff. ¶ 6.) AdvancePCS avers that United's demanded share was unreasonable given that United did no work and bore none of the costs associated with the prescription discount program. (Id.)

claims through August 31, 2001. (Erickson Aff. ¶ 7.) On September 1, ESI updated the message to tell callers that ESI was now the PBM for the AARP Program. (Id.)

Plaintiffs and ESI also sent a letter to AARP Program participants informing them of the change in PBMs and providing them with new cards. (Erickson Aff. ¶ 6 & Ex. A.) Beginning on or about July 23, 2001 and continuing until August 20, 2001, ESI sent the letter and new cards to approximately 3.5 million AARP Program participants. (Id. ¶ 6.) The letter told participants to discard the old cards that had been issued by AdvancePCS and to begin using the new ESI cards on September 1, 2001. (See id. Ex. A.)

## IV. The AdvancePCS Prescription Plan

After AARP, RPS, AdvancePCS, and United had begun discussing a new direction for the AARP Program, AdvancePCS began negotiating with pharmacies to participate in a new prescription drug discount plan of its own.[9] (March 2002 Bessant Aff. ¶ 10.) AdvancePCS

> spent considerable time, effort and resources to create its new program and to introduce it to the market. AdvancePCS made presentations to pharmacy associations and conventions across the United States during the summer of 2001 concerning its new program and has continued with a marketing campaign to seek the assistance of pharmacies to enroll customers in the AdvancePCS program.[10]

---

[9] AdvancePCS avers that it began these negotiations "on and before January 1, 2001 so that it could have a full compliment of pharmacies available on September 1, 2001." (March 2002 Bessant Aff. ¶ 10.)

[10] The only presentation specifically identified by AdvancePCS is a meeting of the National Association of Chain Drug Stores in August 2001, at which AdvancePCS met with representatives of approximately seventy-three pharmacy chains and advised them

(Feb. 6, 2002 Bessant Aff. ¶ 15.)

Sometime before September 1, 2001, AdvancePCS also sent a notice to pharmacies participating in its network that (1) introduced the AdvancePCS Prescription Plan, (2) stated that it would become effective September 1, 2001, and (3) thanked the recipient for its participation in that plan. (Def.'s Ex. 7 (advertisement regarding the AdvancePCS Prescription Plan).) AdvancePCS advised the recipient that "[a]s a participant in the AdvancePCS updated CCP02 network, your pharmacy will automatically be able to fill prescriptions under the *AdvancePCS Prescription Plan*." (Id. (emphasis in original).) At the bottom of the notice, AdvancePCS stated that, "effective September 1, 2001, the AARP Member Choice and Health Care Options programs will no longer be administered by AdvancePCS for Retired Persons Services."[11] (Id.) The notice prominently featured AdvancePCS's BIN and the carrier number for

---

that it planned to continue to use the H020 carrier number for its new prescription discount plan. (March 2002 Bessant Aff. ¶ 5.)

[11] Paragraph 5.1 of the agreement pursuant to which AdvancePCS served as PBM for the AARP Program provides that AdvancePCS

> may not use the name or acronym of AARP, AARP Pharmacy Service, Retired Persons Services, Inc., Member Choice, AARP Health Care Options Prescriptions Saving Service or any subsidiary or affiliate of Retired Persons Services, Inc. or AARP without the express advance written approval of [RPS] in its sole discretion.

(Def.'s Ex. 2, ¶ 5.1.) The obligations of that provision survive the termination of the agreement. (Id., ¶ 7.3.2.) There is no evidence in the record that AdvancePCS obtained RPS's advance written approval before sending its mass mailing to pharmacies.

AdvancePCS's new plan: H020. (Id.) AdvancePCS promoted to the pharmacies the fact that there were no enrollment fees or monthly or annual membership fees for "plan members," i.e., the customers of the pharmacy. The advertisement further stated:

> ***If you wish to convert patients*** from other unfunded programs and provide them immediate service through our new program, effective September 1, 2001, ***you may submit transactions using existing patient profile information to AdvancePCS RxBIN 610415 under carrier H020 for processing under the AdvancePCS Prescription Plan.***

(Id. (emphasis added).) Finally, the notice said that AdvancePCS would pay an "enrollment fee" for switching customers to the AdvancePCS Prescription Plan. (Id.)

## V. Events Since September 1, 2001

Since September 1, 2001, prescription discount claims for AARP Program participants have continued to be transmitted to AdvancePCS. How these discount claims are handled by AdvancePCS depended upon whether or not the pharmacy sending in the claim has agreed to participate in the AdvancePCS Prescription Plan.

If a pharmacist who is part of AdvancePCS's network and is participating in AdvancePCS's new prescription drug program is presented with a prescription or refill by a customer who historically has received discounts under the AARP Program, and if the pharmacist relies on the patient profile already contained in the pharmacy's computer database, the claim is sent to AdvancePCS because AdvancePCS's BIN number is part of the customer profile in the pharmacy's database. AdvancePCS, upon receiving the claim, treats the customer as an enrollee in its own discount card program, processes the discount, and collects a fee for processing the claim. (Hedblom Aff. ¶¶ 16, 17.) There is

no evidence in the record to suggest that AdvancePCS's enrollment of the customer is the result of a knowing choice by the paying AARP Program participant to sign up for and participate in AdvancePCS's discount program.

Five pharmacy chains that participate in the AARP Program have declined to participate in the AdvancePCS Prescription Plan: CVS, Albertsons, Kerr Drug, Inc., Super D Drugs, and Fruth Pharmacy. (Erickson Aff. ¶ 14.) Since September 1, 2001, CVS pharmacists who have submitted a discount claim for a customer using the old AARP Program profile (which contains AdvancePCS's BIN and carrier numbers) have received messages from AdvancePCS stating that CVS is "not enrolled" in the network for the program the pharmacists were trying to process. (Morrison Aff. ¶ 12.) These CVS pharmacists understand the message to mean that CVS is no longer participating in the network serving the AARP Program, an understanding that is incorrect because CVS is participating in the AARP program. (Id.) When CVS pharmacists call AdvancePCS in response to the "not enrolled" message, AdvancePCS has told them that CVS does not participate in the pharmacy network and would have to send the customer attempting to use the discount to another pharmacy. (Id. ¶ 13.)

Sometime after September 1, 2001, AdvancePCS sent a second, revised notice to pharmacies participating in its electronic data transmittal network. This notice invited pharmacies to call a toll-free telephone number to receive "member education material." (Simos Aff. Ex. A.) AdvancePCS also modified the language from the first notice that invited pharmacies to "convert" patients to the AdvancePCS Prescription Plan, stating

instead "[i]f you wish to offer this program to patients in other unfunded programs and provide them immediate service through our new program, please provide them with information on the AdvancePCS Prescription Plan." (Id.) The notice reminded the recipients that (1) effective September 1, 2001, AdvancePCS was no longer administering the AARP Member Choice and Health Care Options programs; and (2) AdvancePCS would pay an incentive to the pharmacies to encourage customers to switch to the AdvancePCS Prescription Plan. (Id.)

**VI. Plaintiffs' Response to AdvancePCS's Actions**

On September 25, 2001, AARP wrote to the general counsel for AdvancePCS to express AARP's concerns that thousands of consumers who have paid to participate in the AARP prescription discount card program have been diverted to the AdvancePCS Prescription Plan without their informed consent. (Hsu Aff. Ex. 1.C (Sept. 25, 2001 letter to DeMars).) On October 1, 2001, ESI sent an updated pharmacy notification which outlined the importance of processing AARP program discount claims under the correct BIN, carrier, and group codes. (Erickson Aff. ¶ 9 & Ex. C.) ESI sent the message by "blast fax" and e-mail to all AARP network pharmacies. (Erickson Aff. ¶ 9.)

After October 10, 2001, AdvancePCS caused the following message to appear to pharmacies in connection with every transaction that it processed: "Thanks for using new

AdvancePCS Prescription Plan. We no longer process AARP."[12] (Feb. 6, 2002 Bessant Aff. ¶ 17.)

On November 6, 2001, ESI sent letters via e-mail and US Mail to high-level contacts at the pharmacy chains representing 93% of all discount claim volume originating from pharmacy chains. (Erickson Aff. ¶ 10 & Ex. D.) The letter advised these managers that "if a pharmacy submits a refill or new script for an AARP member under the old AARP profile (using the [AdvancePCS] BIN and Carrier numbers), the claim will be processed as a paid claim under the new [AdvancePCS] plan." (Erickson Aff. Ex. D.) The letter also informed the chain of how many fewer claims it had sent for discounts under the AARP in September (the first month with ESI as PBM) as compared to August. (Id.)

## VII. Pharmacies' Response to AdvancePCS's Actions

After September 1, some pharmacy chains began "blocking" claims submitted using the H020 carrier number. (Erickson Aff. ¶ 12.) Pharmacies have instituted the "block" in various ways; some have used it to prompt the pharmacist to ask the customer for his or her new discount card, whereas others have used it as a prompt to route claims for AARP program participants to ESI for processing. (Id. ¶ 13.) Where chain

---

[12] AdvancePCS avers that this message appears at the same point in time in the transaction as the DUR message regarding drug interactions. (Feb. 6, 2002 Bessant Aff. ¶ 18.) Thus, it appears **after** AdvancePCS has already processed the discount claim. AdvancePCS also avers that where the DUR or "We no longer process AARP" message appears on the pharmacy computer screen depends upon each pharmacy's software program. (Id.)

pharmacies have instituted blocks, the weekly volume of discount claims submitted for the AARP Program has returned to levels consistent with the activity for the program prior to September 1, 2001. (Id., Exs. E & G.) Chain pharmacies that have not instituted blocks and are participating in the AdvancePCS network, however, saw a dramatic decline (around 50%) in the weekly volume of claims submitted for the AARP program – a decline that has not changed substantially in subsequent months. (Id. ¶ 13, Exs. F & G.)

**Analysis**

Whether preliminary injunctive relief should be granted depends on an evaluation of the following factors. (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunctive relief will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. See Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). "When applying the Dataphase factors, as they have come to be called, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (internal quotation marks and citations omitted). The party requesting preliminary injunctive relief bears the "complete burden" of proving all the factors listed above. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

The likelihood of success on the merits is not, alone, determinative. See Dataphase, 640 F.2d at 113. Rather, a court must consider the particular circumstances of

each case, remembering that, "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Id. If the threat of irreparable harm to the movant is slight when compared to the likely injury to the other party, the movant carries a particularly heavy burden of showing a likelihood of success on the merits. See Dataphase, 640 F.2d at 113.

### A. Threat of Irreparable Harm

Plaintiffs argue that AdvancePCS's actions not only present a threat of irreparable harm to them, they have in fact been irreparably harmed. Whether a threat of irreparable harm exists is a threshold inquiry for a preliminary injunction motion; if the party seeking an injunction fails to show such a threat, preliminary injunctive relief is inappropriate, regardless of the other factors. See Dataphase, 640 F.2d at 114, n. 9. If monetary damages "cannot be calculated with a reasonable degree of certainty or will not adequately compensate the plaintiff," the harm to the plaintiff is considered irreparable. See AmeriGas Propane, Inc. v. Crook, 844 F. Supp 379, 390 (M.D. Tenn. 1993). Plaintiffs identify several ways in which the Defendant's conduct presents a threat of irreparable harm. For purposes of this analysis, the Court considers each Plaintiff separately.

#### 1. AARP

The arguments regarding the threat of irreparable harm to AARP can be reduced to

one main concern: AdvancePCS's actions threaten to undermine the reputation and goodwill of AARP among its members. AARP asserts that AdvancePCS is compromising the integrity and effectiveness of the AARP Program's DUR service because, each time AdvancePCS processes a discount claim for an AARP Program participant under its own discount plan without the participant's knowledge, it prevents information regarding that prescription from becoming part of the AARP Program's prescription history for that participant. The AARP Program therefore cannot provide accurate DUR protection to AARP Program participants, thus increasing the risk to those participants of exposure to harmful drug reactions. AARP contends that AdvancePCS's interference with the AARP Program's ability to provide the services advertised to participants threatens the valuable reputation and goodwill of AARP.

Defendant responds by minimizing the importance of the DURs that a PBM performs. AdvancePCS contends that a PBM's review of prescription histories is by no means the only protection offered to AARP Program participants to prevent harmful drug interactions; doctors themselves perform DURs. AdvancePCS has also presented evidence that a DUR is most pertinent for new therapies, since any renewal therapy would previously have been passed through a DUR. (Johnson Aff. ¶ 5.) Thus, in light of the fact that senior citizens typically use chronic repetitive therapies, most AARP program participants are not likely to be harmed by the absence of a DUR conducted by

the PBM.[13] (See id.) AdvancePCS's arguments are countered, however, by evidence that, during two months of 2001 alone, ESI sent DUR alerts regarding potential problems with prescriptions (including drug interactions and over-utilizations) for 227,975 claims submitted for AARP Program participants, as a result of which pharmacists reversed 36,751 claims (i.e., did not fill the prescription). (Hedblom Aff. ¶ 23.)

AdvancePCS further argues that there can be no threat of irreparable injury to AARP because Plaintiffs waited several months to start this action and seek a preliminary injunction. Plaintiffs respond that several months of investigation were necessary to uncover the full scope and nature of AdvancePCS's actions and, additionally, that they sought to resolve this dispute short of litigation. (Pls.' Reply Mem. at 3; Erickson Aff. ¶¶ 9-12, 16-20.) After bringing this action in mid-December 2001, Plaintiffs moved for a preliminary injunction within two weeks. The Court concludes that Defendant's arguments regarding delay impact, at most, the degree of the threat of irreparable harm, not its existence. Furthermore, it is reasonable to infer that harm to goodwill and reputation may take months to become manifest; thus, an absence of numerous complaints by AARP members during the first six months of AdvancePCS's conduct is not dispositive of the issue.

---

[13] AdvancePCS also contends that the DURs performed by a PBM are not foolproof because a customer might go to a non-network pharmacy, thereby preventing the PBM from having a complete prescription history. This assertion is countered by evidence that AARP members pay a subscription fee to obtain the benefit of the prescription discount program, supporting a reasonable inference that an AARP Program participant has an incentive to go to a network pharmacy in order to obtain that discount.

AARP members have paid to participate in a prescription drug discount program that has been advertised to them as providing several benefits, including a DUR service that screens for potential problems with prescriptions. The number of AARP Program participants who benefit from a DUR is not insignificant. It appears likely, from the record currently before the Court, that Plaintiffs will be able to establish that the majority of AARP Program participants for whom AdvancePCS has processed discount claims since September 1, 2001, have no idea that they been enrolled in and received discounts under a program other than the AARP Program. Therefore, AARP Program participants who become dissatisfied with the level of discounts received through AdvancePCS,[14] or who have an adverse drug reaction because the PBM processing the claim (whether ESI or AdvancePCS) does not have a complete prescription history, may reasonably be expected to attribute these shortcoming to AARP. AARP's reputation will be tarnished and the goodwill AARP has with its members diminished, harms for which there is no adequate remedy at law. See Iowa Utilities Bd. v. Fed. Communics. Comm'n, 109 F.3d 418, 426 (8th Cir. 1996) (concluding that the "potential loss of consumer goodwill

---

[14] Evidence presently before the Court suggests that each PBM negotiates with drug companies for discounts. It is therefore reasonable to infer that the discounts one PBM might be able to secure (based on volume and other factors) will not be the same as the discounts another PBM might be able to negotiate. Therefore, it is reasonable to expect that the discounts available to consumers will not be identical as between the AARP Program and the AdvancePCS program. AdvancePCS's representation at oral argument that its discounts on September 1, 2001 (as PBM of its own plan) were the same as its discounts on August 31, 2001 (as PBM of the AARP Program) says nothing about the current level of discounting available under both plans.

qualifies as irreparable harm" sufficient to warrant a stay under factors that parallel the Dataphase factors). AARP has adequately established a threat of irreparable harm.

### 2. United

United raises similar concerns regarding its reputation and goodwill. It contends that, having secured an exclusive relationship with AARP to service the AARP Program, it has dedicated substantial resources to being able to strategically position the AARP Program as a model within the industry. AdvancePCS's conduct in diverting discount claims for AARP Program participants into its prescription discount program has frustrated and threatens to further frustrate United's business advantage arising out of its exclusive relationship with AARP. United contends that confusion has in fact arisen among pharmacies, including major pharmacy chains such as CVS, over the handling of AARP Program discount claims, creating the threat that these pharmacies' opinion and goodwill toward both AARP and United will be diminished.

AdvancePCS argues that United cannot establish a threat of irreparable harm because they have asserted a claim for money damages for revenues lost in connection with the discount claims that AdvancePCS has diverted from the AARP Program. The fact that United has asserted a claim for money damages is not mutually exclusive with a threat to United's reputation and goodwill with the pharmacies with which it works. As the Court observed above, a harm to goodwill and reputation is not readily translatable into money damages. The Court concludes that United has established a threat of irreparable harm.

### B. Likelihood of Success on the Merits

Plaintiffs assert that there is a strong likelihood that they will succeed on the merits of three of the causes of action asserted in the First Amended Complaint: (a) violations of the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. §§ 325D.43 - 325D.48; (b) violations of Minn. Stat. § 325F.71, which provides a supplemental civil penalty for deceptive acts perpetrated against senior citizens; and (c) tortious interference with prospective contractual relations. The Court considers each in turn.

#### 1. Violations of the MDTPA

Plaintiffs allege that AdvancePCS has, since learning of its termination as PBM for the AARP Program, violated several provisions of the MDTPA. The MDTPA provides that a person engages in a deceptive trade practice when the person, inter alia:

> (1) passes off goods or services as those of another;
>
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
>
> * * * * *
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
>
> * * * * *
>
> (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn. Stat. § 325D.44, subd. 1.

Defendant sweepingly contends that "claims brought under the [MDTPA] mirror claims brought under the Lanham Act" (Def.'s Mem. Opp. Mot. for Prelim. Inj. at 17); thus, "to establish a claim under sections (2) and (3) of the DTPA, a competitor must establish the requisite elements for a cause of action for infringement of a protected mark or trade name under the Lanham Act." (Id. at 18.) The undersigned has indicated that "mirroring" between the MDTPA and the Lanham Act occurs to the extent the MDTPA provides a remedy for false advertising that is also actionable under the Lanham Act. Medical Graphics Corp. v. SensorMedics Corp., 872 F. Supp. 643, 649 (D. Minn. 1994) (Kyle, J.) (observing that Minnesota's federal district courts "use the same analysis to evaluate ***false advertising claims that are made simultaneously*** under the federal and state statutes.") (emphasis added); see also Multi-Tech Sys., Inc. v. Hayes Microcomputer Prods., Inc., 800 F. Supp. 825, 847 (D. Minn. 1992) (Doty, J.) ("The [MDTPA] covers false advertising and plaintiffs typically assert claims under that Act in conjunction with the Lanham Act, 15 U.S.C. § 1125(a).").

The other cases cited by AdvancePCS recognize a similar "mirroring" between the MDTPA and the Lanham Act with respect to trademark infringement. Transclean Corp. v. Bridgewood Servs,, Inc., 77 F. Supp. 2d 1045, 1091-92 (D. Minn. 1999) (Erickson, J.) (reasoning that "***[i]n the context of trademark infringement***, the standards employed under the Lanham Act and the [MDTPA] are substantially the same."); Shade's Landing,

Inc. v. Williams, 76 F. Supp. 2d 983, 987 n.2 (D. Minn. 1999) (Tunheim, J.) (observing that the parties "made no distinction between the Lanham Act and the MDTPA in their supporting memoranda, addressing plaintiff's claims together under the Lanham Act and the judicial opinions interpreting it," and therefore analyzing a trademark infringement claim under the Lanham Act); Hillerich & Bradsby Co. v. Christian Bros. Inc., 943 F. Supp. 1136, 1140 (D. Minn. 1996) (Tunheim, J.) (recognizing that "***in the context of trademark infringement***, the [MDTPA] creates claims that mirror those under the Lanham Act."). None of these cases holds that the only conduct for which a remedy can be obtained under the MDTPA is conduct actionable under the Lanham Act. Defendant's efforts to impose the constraints of the Lanham Act onto Plaintiffs' MDTPA claims are without merit.

AdvancePCS also argues that Plaintiffs cannot prevail on their MDTPA claim because no "good" or "service" is involved. AdvancePCS contends that a purely monetary transaction (such as a loan) is not a good or service for purposes of the MDTPA, and that the Plaintiffs' First Amended Complaint focuses on the transaction between AdvancePCS and the pharmacy that adjudicates the discount claim transmitted to the PBM. Because the discount is just a monetary transaction, there is no good or service.

This argument is countered by the Plaintiffs' evidence regarding AARP's marketing of its prescription drug discount plan as a service to its members. It also is countered by evidence that the PBM actively negotiates discounted prices with the drug

companies on behalf of the program participants. Furthermore, the argument is inconsistent with AdvancePCS's contention that its own "Prescription Plan" offers purchasers of prescription drugs a superior program for obtaining prescription discounts -- i.e., it offers consumers a superior service. Nor is there any dispute that the DURs performed by the PBM of a drug discount program are a service to both the dispensing pharmacist and the individual patient. AdvancePCS's argument that no "good" or "service" is implicated by the Plaintiffs' MDTPA claim is without merit. The Court turns to the separate subparts of the MDTPA that Plaintiffs have asserted in claiming a violation of the statute.

*a. Passing off*

Minnesota's state courts have not defined what constitutes "passing off" goods or services as those of another under subpart (1) of section 325D.44, subdivision 1. Other jurisdictions, however, have concluded that "[a]ny conduct, the nature and probable tendency and effect of which is to deceive the public so as to "pass off" the goods or business of one person as and for the goods or business of another" violate the Deceptive Trade Practices Act. Morton B. Katz & Assocs., Ltd. v. Arnold, 333 S.E.2d 115, 116 (Ga. Ct. App. 1985); see also Worthington Foods v. Kellogg Co., 732 F. Supp. 1417, 1431 (S.D. Ohio 1990) (holding that a defendant engages in "passing off" goods when it "attempts to bring about customer confusion by causing customers to purchase its products under the mistaken belief that they are in fact purchasing the plaintiff's goods."). Defendant argues that Plaintiffs cannot establish a likelihood of success on a "passing

off" claim because "this is not a situation where a company has relabeled a product and passed it off as its own." (Def.'s Mem. Opp'n to Mot. for Prelim. Inj. at 17.) AdvancePCS contends that it is transacting business ***as itself*** and not as AARP or United and, therefore, is not passing off its services as being the Plaintiffs'.

Plaintiffs argue that one must look at the transaction from the consumer's point of view. The record establishes that AdvancePCS is relying upon previously programmed settings in pharmacy databases to "convert" customers to the AdvancePCS Prescription Plan who prior to September 1, 2001 would have been processed under the AARP Program. From the perspective of the AARP Program participant, who apparently has no knowledge that he or she as been "enrolled" in AdvancePCS's program, the Defendant's conduct has the probable tendency and effect of deceiving those AARP members into believing that the discount they received on their prescription, and the DUR performed for the pharmacist before the prescription was filled, were done through the AARP Program. On the record presently before the Court, there is a clear likelihood of success on the merits of a "passing off" claim.

***b. Likelihood of confusion or misunderstanding as to sponsorship, approval, or certification of services; and the likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another***

Subparts (2) and (3) of subdivision 1 of section 325D.44, focus on conduct that gives rise to a likelihood of confusion or misunderstanding as to either (a) the defendant's affiliation, connection, or association with another, or (b) the sponsorship or approval by

another of the person's goods or services. To establish liability under the MDTPA, a complainant need not prove competition between the parties or ***actual*** confusion or misunderstanding. Minn. Stat. § 325D.44, subd. 2. Proof of a mere likelihood of confusion or misunderstanding is sufficient. Claybourne v. Imsland, 414 N.W.2d 449, 451 (Minn. Ct. App. 1987). Plaintiffs claim that, under subparts (2) and (3) of the MDTPA, AdvancePCS's continued use of the carrier and group numbers associated with the AARP Program (as opposed to changing or "turning off" those numbers) causes pharmacies to submit discount claims for AARP Program customers to AdvancePCS, who processes the claims as though they had been made under its own competing discount plan and collects fees for their processing. Plaintiffs argue that AdvancePCS's conduct is not only likely to cause confusion or misunderstanding among pharmacies and AARP Program participants as to whether discount claims are being processed on behalf of AARP (as opposed to for AdvancePCS's own benefit), it has actually caused such confusion and misunderstanding.

AdvancePCS contends that Plaintiffs cannot establish a likelihood of success under section (2) of the MDTPA because they have no legally protectable interest in the carrier or group numbers or "any mark or trade name associated with the 'carrier-group' numbers."[15] (Def.'s Mem. Opp'n to Mot. for Prelim. Inj. at 19.) AdvancePCS argues that

---

[15] Defendant also argues that, because Plaintiff have not claimed infringement of a protected mark or trade name, there can be no likelihood of success on the merits of a claim under section (2) of the MDTPA. (Def.'s Mem. Opp'n to Mot. for Prelim. Inj. at 17-19.) As discussed above, the MDTPA overlaps with the Lanham Act in certain

Plaintiffs either should have (1) obtained some interest in the carrier and group numbers, or (2) sought an agreement with AdvancePCS that it would not continue to use those numbers after termination as the PBM; Plaintiffs' failure to do so cannot be solved by an injunction, AdvancePCS contends.

AdvancePCS is incorrect. AARP certainly has a legally protectable interest in a mark or trade name associated with the carrier and group numbers. Those numbers appeared on discount cards which bore the name and logo of AARP and the name of AARP's prescription discount program. (Hedblom Aff., Ex. A.) Pharmacists entered the carrier and group numbers into their computer systems from the cards bearing the AARP name and logo. (See Morrison Aff. ¶¶ 5, 6.) The carrier and group numbers at issue on this motion have been "associated with" a mark or trade name of AARP.

The evidence now before the Court supports a determination that AdvancePCS is processing discount claims for AARP Program participants under circumstances in which it is questionable whether either the participant or the pharmacist is aware that the participant has been "enrolled" in or "converted" to AdvancePCS's plan. The participants have in their possession only an AARP Program card.[16] Presentation of the

---

contexts, but is not confined to the metes and bounds of the federal statute.

[16] Counsel for AdvancePCS acknowledged at oral argument that AdvancePCS had not sent any cards to its "enrollees" to date, but intended to do so in the future. The Court notes that this future intent to issue cards is inconsistent with AdvancePCS's argument that its "Prescription Plan" is superior to the AARP Program because no card is required and the customer can be enrolled "immediately" at a point-of-sale.

AARP card causes the pharmacists to understand that the customer is requesting discounts on prescription drugs through the AARP Program. The record presently before the Court also supports Plaintiffs' contention that AdvancePCS's conduct is contrary to standard practices in the pharmacy industry, according to which a company that no longer administers a prescription drug program "turns off" its carrier number and rejects claims submitted under that number. Pharmacists generally rely on the PBM to alert them to any changes relating to specific carrier or group numbers, or a participant's eligibility under a particular program. (Morrison Aff. ¶ 7; Hedblom Aff. ¶ 13; Simos Aff. ¶ 13; Kneese Aff. ¶ 11.)

AdvancePCS responds that this "industry practice" is based upon "funded programs," for which the program administrator must turn off the carrier number to avoid incurring a financial obligation to pay for prescriptions. (March 2002 Bessant Aff. ¶ 3.) AdvancePCS asserts that the "funded-card" industry is completely different from the "cash-card" industry, and that there is little industry practice with respect to the termination of cash-card programs because very few cash card programs have terminated or changed PBMs. (Id.) The Court recognizes that disputed issues of fact exist regarding what constitutes industry practice. From the record presently before it, however, the Court concludes that Plaintiffs are reasonably likely to establish that AdvancePCS's conduct deviated from pharmacists' general expectations and understanding concerning the treatment of claims by a PBM that is no longer administering a pharmacy benefit program. The Court concludes that there is a likelihood of success on the merits of

Plaintiffs' claims under subsections (2) and (3) of the MDTPA.

### c. ***Representations that the person has a sponsorship, approval, status, affiliation, or connection that it does not have***

Plaintiffs allege that AdvancePCS's conduct in diverting discount claims of AARP Program participants into the AdvancePCS plan violates subpart (5) of section 325D.44, subdivision 1, because "Defendant has thereby concealed from such participants the fact that, contrary to their expectation and belief, they are not receiving important AARP Program services such as the DUR." (First Am. Compl. ¶ 50.) The AARP Program participants' expectation and belief arise from their payment of an annual subscription fee for the AARP Program.

The operative word in subpart (5) is "representation." The comments to the Uniform Deceptive Trade Practices Act state that subpart (5) is meant to deal with "false advertising of goods, services or businesses. It includes false representations that a person is the representative, successor, associate, or affiliate of another." 1966 Uniform Deceptive Trade Practices Act (U.L.A.) § 2(5), cmt. Thus, under the MDTPA, unauthorized endorsements by a celebrity athlete have been held to be actionable under subpart (5) of section 325D.44. Hillerich & Bradsby Co., 943 F. Supp. at 1140.

On the record currently before the Court, it does not appear that AdvancePCS has made any representations following its termination as PBM of the AARP Program that could be considered false advertising or otherwise false or misleading regarding whether AdvancePCS has sponsorship, approval, an affiliation, or a connection with AARP. This

conclusion is made based upon the limited record before the Court on the preliminary injunction motion. The Court recognizes that evidence regarding actionable representations might be developed during discovery. Based on the record now before it, however, the Court concludes Plaintiffs have not established a likelihood of success on the existence of a MDTPA violation under subpart (5).

***d. Other conduct that creates a likelihood of confusion or misunderstanding***

Subpart (13) of section 325D.44, subdivision 1, provides a catchall for other conduct creating a likelihood of confusion or misunderstanding. Minn. Stat. § 325D.44, subd. 1(13).[17] AdvancePCS argues that Plaintiffs cannot state a claim under subpart 13 of section 325D.44 because the First Amended Complaint merely asserts nonfeasance -- that is, that AdvancePCS failed to act when Plaintiff contend that it should have acted. (Def.'s Mem. Opp'n to Mot. for Prelim. Inj. at 23.) This characterization of the First Amended Complaint is not accurate. Plaintiffs complain that AdvancePCS is engaged in affirmative conduct that is deceptive -- the continued processing of AARP Program participants' discount claims submitted under profiles created when AdvancePCS was the PBM of the AARP program. Furthermore, Plaintiffs complain that AdvancePCS has chosen to act in a manner inconsistent with pharmacists' expectations and understanding

[17] This section itself refutes AdvancePCS's arguments that the only conduct actionable under the MDTPA is conduct that supports a claim under the Lanham Act. As the comments to the Uniform Deceptive Trade Practices Act show, "[t]his subsection permits the courts to block out new kinds of deceptive trade practices." 1966 Uniform Deceptive Trade Practices Act (U.L.A.) § 2(12), cmt.

regarding the submission of claims to a PBM. According to Plaintiffs, AdvancePCS's actions constitute a "hijacking" of the discount claims of paid AARP Program participants who have no knowledge that they are now receiving prescription discounts and DUR services under AdvancePCS (as opposed to AARP). From the record presently before the Court, it appears that AdvancePCS's actions create a likelihood of confusion or misunderstanding among AARP Program participants (and the pharmacies who have agreed to take part in the AARP Program) regarding the source or affiliation of the prescription discounts and DURs that AdvancePCS has been transmitting since September 1, 2001 under the aegis of its own program. There is a likelihood of success on the merits of a claim that AdvancePCS is violating subpart (13) of section 325D.44.

### 2. Violations of Minn. Stat. § 325F.71

Section 325F.71 provides for a supplemental civil penalty against persons who engage in conduct prohibited by the MDTPA and whose conduct has been perpetrated against one or more senior citizens -- i.e., individuals who are age 62 or over. Minn. Stat. § 325F.71, subds. 1(a) and 2(a). The court considers several factors in determining whether to impose a supplemental civil penalty, and in what amount, including (a) whether the defendant knew or should have know that its conduct was directed to one or more senior citizens; and (b) whether the defendant's conduct caused senior citizens to suffer substantial loss of assets essential to the health or welfare of the senior citizen. Id., subd. 2(b)(1) and (2).

AdvancePCS argues that Plaintiffs cannot establish a likelihood of success on the

merits of their claim under section 325F.71 because they are not the sort of person for whom the Minnesota Legislature has provided a private remedy. The statute states that "***[a] person injured by a violation of this section*** may bring a civil action and recover damages, together with costs and disbursements including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Id., subd. 4 (emphasis added). No Minnesota court has squarely addressed the scope and application of section 325F.71, thus presenting a question of first impression. Based on the plain language of the statute, it appears that the Minnesota legislature did not intend to limit the private remedy to senior citizens – if it had, it could simply have used the term "senior citizen" (specifically defined in the statute) in place of the broader term "person." One can certainly conceive of situations in which a person other than a senior citizen can be injured by a deceptive act perpetrated against one or more senior citizens.

The Court rejects AdvancePCS's proposed statutory construction argument as unpersuasive. To the extent the Plaintiffs have established a likelihood of success on the merits on their claim under the MDTPA, there also exists a likelihood of success under section 325F.71 of the Minnesota Statutes.

### 3. Tortious Interference with Prospective Business Relations

In Count III of the First Amended Complaint, Plaintiffs claim that AdvancePCS is liable at common law for tortiously interfering with United's prospective economic advantage relating to its relationship with AARP drug discount program participants.

Under Minnesota law,

> [t]o establish a claim for tortious interference with prospective business relations, "a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship." Hunt v. University of Minn., 465 N.W.2d 88, 95 (Minn. Ct. App. 1991) (citing United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982)). Justification or privilege is a defense to a claim of tortious interference. Nordling v. Northern States Power Co., 478 N.W.2d 498, 506 (Minn. 1991).

Glass Service Co., Inc. v. State Farm Mut. Auto. Ins. Co., 530 N.W.2d 867, 871 (Minn. Ct. App. 1995). "[O]ne intentionally and improperly interferes with another's prospective business relation by (1) inducing a third person not to enter into or to continue the prospective relation, or (2) preventing the other from continuing the prospective relationship." Hough Transit, Ltd. v. National Farmers Org., 472 N.W.2d 358, 361 (Minn. Ct. App. 1991) (citing United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-33 (Minn. 1982)).

Specifically, Plaintiffs allege that AdvancePCS was aware that United was responsible for the overall operations of the AARP Program, including the processing of all claims submitted on behalf of AARP Program participants. (Amended Compl. ¶ 58.) With that knowledge, AdvancePCS diverted to its own drug discount program claims that the AARP participants intended to have processed by United. (Id. ¶ 59.) United claims that, as a result of AdvancePCS's conduct, "United was deprived of significant business opportunities, i.e., the opportunity to process claims submitted on behalf of AARP Program participants." (Id. ¶ 60.) United further alleges that the consequence of AdvancePCS's conduct has been to cause United to lose profits, incur additional business

expenses and suffer other pecuniary injuries in the amount of approximately $54 million. (Id. ¶ 63.)

AdvancePCS argues that United lacks standing to assert a claim for tortious interference with prospective business advantage as pleaded in the First Amended Complaint because the asserted prospective business advantage, the processing of discount claims for AARP Program participants and the preparing of DURs, is not done by United but rather by ESI. The Court has carefully compared the claim of interference with prospective business advantage alleged in the Complaint to the arguments made in support of the pending motion.[18] From the record presently before it, it appears that United has not demonstrated that the alleged advantage being interfered with is one attributable to United. The Court concludes that, with respect to the tortious interference claim, United has failed to demonstrate a likelihood of success on the merits.

### C. Balance of the Harms

AdvancePCS argues that the harm to it if an injunction issues would be far greater than the harm posed to the Plaintiffs if the injunction is not entered. AdvancePCS

---

[18] Plaintiffs argue that United entered into a contract with AARP to administer, inter alia, the AARP Program and that fees from AARP members to participate in the AARP Program are paid to United, not ESI. (Pl.'s Reply Mem. at 8 & n.8.) United argues that, in entering into an exclusive relationship with AARP to manage the AARP Program, it had an expectation that a specific, identifiable pool of customers would be available to it – i.e., that current participants in the AARP Program would continue to renew their subscriptions to that service. The prospective business relationship of the continued subscription of AARP Program participants in the program, is not alleged in the First Amended Complaint.

specifically argues that an injunction will place tremendous burdens on the operation of its prescription discount plan. Specifically, AdvancePCS claims (without record support) that "enjoining Advance will require it to recall all of its pharmacy discount cards and reissue new cards with new carrier numbers." (Def.'s Mem. Opp'n to Mot. for Prelim. Inj. at 30.) This assertion is surprising given (1) the representations made by Defendant's counsel at the motion hearing, in response to the Court's questions, that AdvancePCS had not yet sent out cards to persons who have been "enrolled" in its Prescription Plan and intended to do so in the near future, and (2) arguments made by Defendant's counsel that one advantage of the AdvancePCS Prescription Plan is that the customer need not present a card to get a discount on prescriptions. Based on the record before it, the Court cannot find that AdvancePCS must "recall" and "reissue" cards, let alone that such an effort would be unduly burdensome.

AdvancePCS further argues that a wholesale rejection of prescription discount claims six months into AdvancePCS's program will erode AdvancePCS's business goodwill during a critical start-up period. There is no evidence before the Court that AdvancePCS has any goodwill with the senior citizens, the persons whom the discount program is supposed to benefit. Indeed, there is no evidence to suggest that senior citizens purchasing prescriptions know what AdvancePCS is and what it does. As for AdvancePCS's goodwill and reputation with pharmacies,[19] the evidence presently before

---

[19] AdvancePCS also argues that it has spent "substantial time, effort and resources in developing, implementing and marketing its new plan." (Def.'s Mem. in Opp'n to

the Court suggests that any harm AdvancePCS may suffer due to claim rejections stems directly from AdvancePCS's decision to deviate from standard conventions in the pharmacy industry and to continue processing claims submitted under carrier and group numbers associated with a program for which it was no longer the PBM. The balance of harms weighs in favor of entering the preliminary injunction.

### D. Public Interest

AdvancePCS's main argument with respect to the public interest factor is that an injunction would squelch competition in the prescription discount card program market and, in fact, deprive the market of a prescription discount plan superior to that offered by AARP. For example, Defendant asserts that, "***[a]s an incentive for customers to join***, AdvancePCS also offered open, instant, point-of-sale enrollment so that, contrary to the AARP program, customers could join AdvancePCS's program immediately and would not have to find or wait for a card." (March 2002 Bessant Aff. ¶ 10 (emphasis added).) There is no evidence before the Court, however, that ***either*** AdvancePCS ***or*** a single pharmacist at one of the over 47,000 pharmacies participating in AdvancePCS's network has discussed with a single AARP Program participant that the AdvancePCS plan exists,

---

Mot. for Prelim. Inj. at 31.) With the exception of evidence regarding two mass mailings to pharmacies and one presentation to a conference of pharmacy chains, nothing in the record tends to suggest that the time, effort, and resources AdvancePCS expended were "substantial." Indeed, from the record presently before the Court, one could reasonably infer that AdvancePCS adopted its strategy for launching its new plan on the assumption that it could "convert" customers from the AARP Program without little effort at all. Relying on the laws of inertia, customers would become automatically "enrolled" in AdvancePCS's plan, and it would continue to realize fees on those claims.

let alone that it is superior to the AARP Program because the customer can instantly enroll at the pharmacy and does not need a card to participate in the program.[20]

AdvancePCS also argues that granting the injunction would place an undue hardship on pharmacies because they would be forced to bear the burden of re-profiling 3.5 million AARP program participants. In advancing this argument, AdvancePCS overlooks several things. The 3.5 million participants in the AARP Program are customers at over 47,000 pharmacies nationwide, and AdvancePCS has itself submitted evidence that customers typically do not go to more than one pharmacy. (Johnson Aff. ¶ 3.) Thus the average number of AARP Program participants per pharmacy is seventy-five. Furthermore, AdvancePCS has itself submitted evidence that prescriptions filled at retail locations are typically filled with a one month supply. (Id. ¶ 4.) Thus, a pharmacist might expect to interact with those AARP Program participants over the course of a month. Finally, there is no evidence in the record tending to show that a pharmacist must create an entirely new profile for each customer; rather, the pharmacist need only change four or five fields on the customer's existing profile to reflect the change in the PBM for the AARP Program.

Therefore, if AdvancePCS must reject all claims using the carrier number H020 and the group numbers specified by Plaintiffs, the rejection would prompt the pharmacist

[20] Indeed, AdvancePCS has repeatedly averred that it has communicated only with pharmacies. There is no evidence that AdvancePCS has engaged in any advertising of its "open enrollment" drug discount program to the public or otherwise has communicated about its new discount prescription program to anyone other than pharmacists.

to speak with their customers about the prescription discount program in which they intend to participate. If they intend to participate in the AARP Program, the pharmacist can readily change the profiles. The average pharmacy would have to deal with between one and three AARP Program participants per day regarding prescription discounts over the course of about a month. The public interest will not be harmed by granting the injunction; indeed, granting the injunction appears to be the most reasonable way to ensure that pharmacists and senior citizens are clear as to the services they are receiving.

**E. Scope of the Injunction**

The Court concludes that the Plaintiffs have established their entitlement to a preliminary injunction based on their state statutory claims.[21] One remaining issue is the appropriate scope of the injunction. Plaintiffs contend that the injunction must be entered nationwide to be effective. AdvancePCS argues that any injunction must be limited to Minnesota because the Court lacks the power to enter a nationwide injunction based upon a state statutory cause of action.

AdvancePCS's claim that this Court lacks the power to enter a nationwide

---

[21] AdvancePCS contends that Plaintiffs are not entitled to injunctive relief because they come to the Court with unclean hands. Specifically, AdvancePCS complains that ESI has contacted various pharmacy chains in the AdvancePCS network "in an attempt to induce these companies to switch AdvancePCS accounts, whether or not AARP members, over to [ESI]." (Def.'s Mem. Opp'n to Mot. for Prelim. Inj. at 10-11, 33.) The Court has examined the record and finds no competent evidence to support this assertion. Where pharmacies have placed "blocks" on discount claims containing the H020 carrier number and group numbers used by AdvancePCS for the AARP Program, the record indicates that such blocks have prompted conversations between pharmacists and customers seeking clarification of the customers' intent as to which plan to use.

injunction is without merit. AdvancePCS has made no argument that this Court lacks personal jurisdiction over it. Having jurisdiction over the Defendant's person, the Court has the power to enjoin the Defendant's conduct nationwide. E.g., Mars. Inc. v. Standard Brands, Inc., 386 F. Supp. 1201, 1206-07 (S.D.N.Y. 1974) (granting motion to stay federal action pending conclusion of earlier commenced state court action given that state court had power to enter nationwide injunction under state Deceptive Trade Practices Act) (citing Pomeroy, Equity Jurisprudence § 1318 (1941 ed.)); see also McCarthy on Trademarks and Unfair Competition § 30.15 (4th ed.) ("It is a familiar rule of Anglo-American law that once a court has obtained personal jurisdiction over a defendant, the court has power to command the defendant to do or not to do acts outside the territorial jurisdiction of the court.").

The cases relied upon by AdvancePCS establish that, in certain circumstances, a federal district court may, it its discretion, limit the geographic scope of an injunction in light of the facts of the case. See Deere & Co. v. MTD Prods., Inc., 860 F. Supp. 113 (S.D.N.Y. 1994). The diversion of claims submitted for AARP Program participants is occurring on a nationwide basis as the result of a discount program AdvancePCS is implementing nationwide. United manages the AARP Program -- which extends nationwide -- from Minnesota, and is threatened with irreparable harm to its management operations here in Minnesota due to AdvancePCS's conduct. Judicial efficiency and economy clearly favor a nationwide injunction. The Court acknowledges that eleven states other than Minnesota have enacted either the 1964 or the 1966 version of the

Uniform Deceptive Trade Practices Act. The Court is persuaded, however, that every jurisdiction either has legislation that prohibits the use of deceptive tactics in business and/or prohibits the deception of consumers or affords protection at common law for interference with existing contractual relations. The preliminary injunction will issue on a nationwide basis.

**F. Amount of the Bond**

The final matter for consideration is the bond required pursuant to Rule 65:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). AdvancePCS argues for a $54 million bond, based on the damages Plaintiffs have claimed in connection with the claims allegedly diverted from the AARP Program. Given the lack of evidence suggesting that AARP Program participants knowingly and consciously "enrolled" in AdvancePCS's new prescription discount plan, there is no basis for concluding that AdvancePCS could have damages approaching such a high figure if it were later to appear that the injunction was erroneously entered.

At oral argument, Plaintiffs asserted that no bond, or at most a bond in the amount of $100,000, is sufficient to secure the injunction. Obviously, from the plain language of Rule 65(c), issuing an injunction without a bond is not possible. Furthermore, given the sheer volume of claims at issue, the bond must clearly be greater than $100,000. The Court orders Plaintiffs to post a bond in the sum of one million dollars ($1,000,000).

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Plaintiffs United HealthCare Insurance Co. and AARP's Motion for a Preliminary Injunction and Related Relief (Doc. No. 14) is **GRANTED** as follows:

1. Defendant AdvancePCS, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with AdvancePCS who receive actual notice of this Memorandum Opinion and Order are enjoined from

> (a) approving prescription discount claims containing or otherwise using the carrier number "H020," including but not limited to prescription discount claims using the carrier number "H020" in combination with any of the following group numbers -- 2100, 2200, 2300, 2400, and 3001-3051;
>
> (b) continuing to approve prescription discount claims for any AARP Program participant for whom, prior to September 1, 2001, AdvancePCS approved claims pursuant to its agreement with Retired Persons Services, Inc.;
>
> (c) treating prescription discount claims containing or otherwise using the unique carrier and group numbers that AdvancePCS had utilized as PBM for the AARP Program, including but not limited to the carrier number "H020" in combination with any of the following group numbers -- 2100, 2200, 2300, 2400, and 3001-3051 -- as claims intended for submission to an AdvancePCS prescription discount plan; and
>
> (d) using any identifying information for any AARP Program participants for the purpose of soliciting those participants or encouraging them to enroll in an AdvancePCS prescription discount plan.

2. AdvancePCS is directed to turn over to Plaintiff United, within twenty-one (21) days of the date on which the bond securing this injunction is posted, all documents and computer records Defendant has collected since September 1, 2001, relating to those persons who, as of August 31, 2001, were participants in the AARP Program, including

any prescription histories for such participants.

3. Plaintiffs shall post bond of one million dollars ($1,000,000) for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined. Upon the posting of the bond, the injunction provided for herein will become effective.

Dated: March 18, 2002

RICHARD H. KYLE
United States District Judge