Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

**HOLLYWOOD HEALTHCARE** CORP., d/b/a LogiMedix, Plaintiff,
v.
**DELTEC**, INC., Defendant.

No. Civ.04-1713(RHK/AJB).

May 17, 2004.

Ronald K. Gardner and Scott Korzenowski, Dady & Garner, PA, Minneapolis, Minnesota, and Robert Zarco and Robert M. Einhorn, Zarco, Einhorn, & Salkowski, PA, Miami, Florida, for Plaintiff.

Jonathan S. Parritz and R. Christopher Sur, Maslon, Edelman, Borman & Brand, Minneapolis, Minnesota, for Defendant.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction

*1 Prior to the present dispute, Plaintiff Hollywood Healthcare Corp ., d/b/a LogiMedix ("LGM") distributed Defendant Deltec, Inc.'s ("Deltec") products. After LGM failed to make good on its debts to Deltec, Deltec informed customers that it would no longer be able to offer its products through LGM. LGM has sued Deltec--and Deltec has counterclaimed--for, among other things, breach of contract. Before the Court are cross-motions for a preliminary injunction. [FN1] For the reasons set forth below, the Court will deny both motions. [FN2]

FN1. Deltec has also filed a Motion for Expedited Discovery.

FN2. The following constitutes the Court's findings of fact and conclusions of law, as required by Rules 52(a) and 65 of the Federal Rules of Civil Procedure . It does not, however, constitute a final resolution on the merits. *See Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court [on a motion for a] preliminary injunction are not binding at trial on the merits.").

Background

*I. The Distribution Agreement*

Deltec, a Minnesota corporation with its principal place of business in St. Paul, Minnesota, manufactures and distributes medical products, including its Cozmo insulin pump. (Kellogg Aff. ¶ 3; Compl. ¶ 2.) On November 18, 2002, Deltec and LGM, a Florida corporation with its principal place of business in Weston, Florida, entered into a "Non-Exclusive Distribution Agreement," in which LGM would distribute Deltec's Cozmo insulin pump in the United States and Puerto Rico. (Kellogg Aff. ¶¶ 7-8, Ex. A (Distribution Agreement); Kusher Decl. ¶ 5; Compl. ¶ 1.)

In the Distribution Agreement, Deltec appointed LGM to be a "non-exclusive distributor" but "reserve[d] the right to sell the Products directly to Customers." (Distribution Agreement § 2.1.) "Customer" is defined as the "end-user patient to which [LGM] sells the Products" (*id.* § 1.1.1) and "Products" is defined as, among other things, Cozmo insulin pumps (*id.* § 1.1.6, Schedule 1). Not only did Deltec reserve the right to sell directly to customers, the Distribution Agreement provided that "[n]othing in this Agreement shall prevent [Deltec] from selling or supplying Products to third parties in or outside" the United States and Puerto Rico. ( *Id.* § 8.2.)

The Distribution Agreement also provided that LGM would pay all invoices submitted by Deltec within 30 days, but if it failed to do so, Deltec was authorized to "withhold shipments of the Products." (*Id.* § 7.4.) Additionally, regardless of payment or non-payment, Deltec could, with notice to LGM, "reject or cancel any order for any or no reason." (*Id.* § 8.1.) Also, both Deltec and LGM agreed to comply with the Health Insurance Portability and Accountability Act ("HIPPA"), as specifically set out in the Distribution Agreement. (*Id.* § 10, Schedule 6.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT Y

As for duration, Deltec could terminate the Distribution Agreement at any time, by providing written notice to LGM in the event LGM was in breach of the Distribution Agreement and had not cured its breach within 30 days of receiving notice. (*Id.* §§ 12.2, 12.2.1.)

*II. The KFLP Guaranty*

On the same day the Distribution Agreement was entered into, November 18, 2002, LGM's President, Robert Kusher, on behalf of the Kusher Family Limited Partnership ("KFLP"), executed a "Guaranty of Payment." (Kellogg Aff. ¶ 19-21, Ex. B (Guaranty).) Under the Guaranty, KFLP guaranteed the payment of all debts and obligations owed to Deltec by LGM. (*Id.* Ex. B (Guaranty).)

*III. LGM Falls Behind on its Payments to Deltec*

***2** Between December 13, 2002 and October 1, 2003, Deltec supplied LGM with over $3.4 million worth of insulin pumps and related products and services. (Kellogg Aff. ¶ 22.) Throughout 2003, LGM distributed over one thousand insulin pumps. (Kusher Decl. ¶ 11.) But by October 1, 2003, LGM owed Deltec over $1.6 million for products and services, of which $1.1 million was over 30 days past due. (Kellogg Aff. ¶ 24, Ex. C.) In early October 2003, Kusher sought financing to pay down LGM's debt (Kellogg Aff. ¶ 25; *see* Kusher Decl. ¶ 14.) In the meantime, Deltec extended credit to LGM for 90 days beginning October 21, 2003, conditioned upon obtaining a security agreement from LGM. (Kellogg Aff. ¶ 26.)

*IV. The Security Agreement*

On November 5, 2003, Deltec and LGM executed a "Security Agreement" in which LGM granted Deltec a security interest in LGM's "Collateral," which was defined as "[a]ll product inventory" and "Accounts Receivable which are lawfully subject to pledge." (Kellogg Aff. ¶¶ 27-28, Ex. D (Security Agreement § 1, Ex. A).) Under the Security Agreement, LGM agreed to furnish Deltec with "statements and schedules further identifying and describing the Collateral." (Security Agreement § 7.) In addition, the Security Agreement was conditioned upon LGM obtaining financing and LGM would be deemed in default if it "[f]ail [ed] ... to secure financing within ninety (90) days of the date hereof to provide sufficient payments to [Deltec] to bring the amount owing by [LGM] to [Deltec] within the payment terms set forth in the Distribution Agreement (specifically within 30 days of invoice date)." (*Id.* § 11(a).)

In the event of LGM's default under the Security Agreement, Deltec had the "right, at its option and without demand or notice, to exercise all the rights and remedies of a Secured Party under the Uniform Commercial Code." (*Id.* § 11.) Deltec subsequently filed a "UCC Financing Statement" with the Florida Secretary of State regarding its security interest in LGM's product inventory and accounts payable. (Kellogg Aff. ¶ 36, Ex. E.)

*V. Hard Times for LGM and Kusher*

On November 7, 2003, Kusher notified Deltec that he was laying off his entire sales force. [FN3] (Kellogg Aff. ¶ 39; *see* Kusher Decl. ¶ 13.) Two months later, on January 8, 2004, Kusher was indicted in Florida for Medicare fraud. (Kellogg Aff. ¶ 41, Ex. G.) On January 9, 2004, Deltec received a "Severe Risk Option" report from Dun & Bradstreet, a commercial provider of business information, identifying LGM as a "Higher Risk" and highlighting Kusher's arrest and indictment. ( *Id.* ¶ 42, Ex. H.)

FN3. The parties dispute what caused the lay-offs. Kusher contends that he had to make the lay-offs because of Deltec's difficulties in supplying products. Without products, Kusher asserts that LGM was unable to support its sales force or meet customer demand. (Kusher Decl. ¶¶ 12-13.) Deltec responds that LGM's lay-offs are not the result of supply shortages. (Kellogg Aff. ¶ 64.) It contends that in early 2003 it voluntarily recalled 173 insulin pumps sold to LGM and that in late 2003 there were delays in its delivery of pumps to LGM as a result of a lag in receiving a specific part from a European parts supplier. (*Id.* ¶¶ 65- 66). By the first week of December 2003, however, Deltec asserts that it filled

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works
Westlaw.

all of LGM's outstanding orders. (*Id.* ¶ 66.)

*VI. Deltec and LGM Try to Continue Working Together*

By February 28, 2004, more than 90 days after signing the Security Agreement, LGM still owed Deltec over $2.25 million, of which $2.2 million was past 30 days due. (Kellogg Aff. ¶ 43, Ex. I .) On March 18, 2004, Deltec proposed that it would continue shipping its products to LGM, but only on the condition that LGM would pay Deltec three times the value of any new order until LGM's debt was repaid. (*Id.* ¶ 44.) On March 24, 2004, Kusher told Deltec that he was not able to pay three times the value of any new orders, but proposed that he would pay for products "C.O.D." plus an additional $10,000. (*Id.* ¶ 46, Ex. J; Kusher Decl. ¶ 16.) Neither side accepted the other's proposal. In addition, Kusher informed Deltec that he was unable to secure the financing needed to repay LGM's debts to Deltec. (Kusher Decl. ¶ 14; Kellogg Aff. ¶ 45, Ex. J.)

*VII. Deltec Sends LGM a Default Notice*

*3 As of March 25, 2004, the amount LGM owed Deltec that was over 30 days past due totaled $2,319,799. (Kellogg Aff. ¶ 49.) On that date, Deltec sent LGM and KFLP a letter notifying them that LGM was in default of its obligations under the Security Agreement, the Distribution Agreement, and the Guaranty. ( *Id.* ¶ 50, Ex. K.) First, Deltec informed LGM that it was in default of § 11(a) of the Security Agreement by failing to secure financing. (*Id.* ¶ 51, Ex. K.) Deltec noted that under § 11 of the Security Agreement, "in the event of a Default, [it] has the right ... to exercise all of the rights and remedies of a secured party under the Uniform Commercial Code," including the right to notify "[LGM's] account debtors to make payment directly to Deltec, and foreclosure of [LGM's] product inventory." (*Id.* Ex. K.)

Second, Deltec informed LGM that it was in default of the Distribution Agreement by failing to pay invoices within 30 days of the invoice date. (*Id.* ¶ 51, Ex. K.) Deltec specifically referred to § 12.2 of the Distribution Agreement, which provides that Deltec may terminate the agreement if LGM is in breach and has not cured its breach within 30 days, and noted that "[t]his letter is the notice required under Section 12.2." (*Id.* Ex. K.) Deltec also informed LGM that it "intends to make its products available directly to customers." (*Id.*)

Finally, Deltec advised that it had learned that LGM was telling customers that the Deltec pumps were "not available" and instructed LGM to cease "from [making] such false and disparaging statements." (*Id.*)

*VIII. Deltec Sends a Letter to Patients and LGM Business Partners*

On March 29, 2004, Deltec mailed a letter notifying all customers that Deltec was no longer able to offer its products through LGM. (Kellogg Aff. ¶ 62, Ex. L; Kusher Decl. ¶ 18.) The letter stated:

Dear Deltec Cozmo(R) Insulin Pump User,
Our records indicate that you purchased your Deltec Cozmo(R) insulin pump through LogiMedix, a Smiths Medical--Deltec distributor located in Weston, Florida. Unfortunately, due to business reasons, we are no longer able to offer Smiths Medical--Deltec products, including infusion sets and cartridges, through LogiMedix effective March 29, 2004.
You can still get infusion sets and cartridges directly from Smiths Medical or another distributor of your choice. Please contact Deltec Customer Service at 1-800-826-9703 for assistance in your next re-order of cartridges and infusion sets for your Deltec Cozmo(R) insulin pump. Plan on allowing a little extra time for your next re-order to be processed as your insurance information will need to be transferred directly to us or the distributor of your choice.
We apologize for this inconvenience and will make every attempt to conduct this transition in a timely and worry free manner so that you can continue to enjoy the benefits of your Deltec Cozmo Insulin Pump without interruption. Do not hesitate to contact

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works
Westlaw.

Deltec Customer Service at 1-800-826-9703 if you have any questions.
*4 Thank you for placing your trust in the Deltec Cozmo Insulin Pump and Smiths Medical.

(Kellogg Aff. Ex. L.) After Deltec's letter was mailed, LGM received calls from patients and others inquiring about LGM's business relationship with Deltec, and one patient told LGM that she opted to deal with another distributor as advised in the letter. (Kusher Decl. ¶ 19.)

*IX. Procedural History*

On April 22, 2004, LGM filed its Complaint alleging six causes of action and requesting preliminary and permanent injunctive relief. (Compl.¶¶ 26-73.) The six causes of action are (1) breach of contract, (2) tortious interference with business relationship, (3) violation of the Minnesota Uniform Deceptive Trade Practices Act, (4) deceptive acts against senior citizens, (5) violation of the Minnesota Uniform Trade Secrets Act, and (6) business defamation. (*Id.*)

On May 5, 2004, Deltec responded by filing an Answer, Counterclaim, and Third Party Complaint against LGM, KFLP, and Kusher. Deltec alleges (1) breach of the Distribution Agreement, (2) breach of the Security Agreement, (3) Guaranty liability, (4) intentional misrepresentation, (5) negligent misrepresentation, (6) violation of the Minnesota Uniform Deceptive Trade Practices Act, and (7) business defamation. It also requests a declaratory judgment "that its use of customer information to communicate with customers concerning continued availability of Deltec products, and to receive payment for purchases of such products, is fully consistent with all applicable agreements between Deltec and LogiMedix, and applicable law." (Compl.¶ ¶ 68-93.)

Standard of Review

Whether preliminary injunctive relief should be granted depends on an evaluation of the following factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981); *see Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir.2003). A preliminary injunction is an extraordinary remedy, and the party seeking injunctive relief bears the burden of proving all the *Dataphase* factors. *Watkins,* 346 F.3d at 844.

Analysis

Both sides have moved for temporary restraining orders or preliminary injunctions. The Court will begin with LGM's motion.

*I. LGM's Motion*

LGM requests an order "preliminarily enjoining DELTEC from continuing to contact LGM's patients, customers, sub-distributors, and business partners." (LGM's Mem. in Supp. at 3.) The Court will start its *Dataphase* analysis by assessing LGM's likelihood of success on its claims.

A. Likelihood of Success

1. Breach of Contract

LGM alleges that Deltec breached two provisions of the Distribution Agreement. (LGM's Mem. in Supp. at 7-8.) First, it asserts that by "effectively terminating" the Distribution Agreement with its March 29, 2004 letter to customers, Deltec breached § 12.2.1 by failing to provide LGM 30 days to cure the defaults it was given notice of four days earlier in the March 25, 2004 default letter. (*Id.* at 8.) LGM responds that LGM has not shown a likelihood of success on this claim because the March 29 letter "was not a premature termination of the Distribution Agreement" (Deltec's Mem. in Opp'n at 19) and that it "was specifically permitted by the Distribution Agreement, the Security Agreement, and the U.C.C. to contact the customers" (*id.* at 15).

*5 LGM has not shown a likelihood of success on its claim for breach of § 12.2.1. It is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

unlikely that LGM can succeed on its major premise--i.e., that Deltec's March 29 letter "effectively terminat[ed]" the Distribution Agreement. Deltec's letter states, in pertinent part, "Unfortunately, due to business reasons, we are no longer able to offer Smith Medical--Deltec products, including infusion sets and cartridges, through LogiMedix effective March 29, 2004." (Kellogg Aff. Ex. L.) This language does not state that the Distribution Agreement was or will be terminated, but simply that Deltec will not be offering its products though LGM. When the letter was written, not offering products through LGM was an option Deltec had available to it under the existing Distribution Agreement. At that time, the amount LGM owed Deltec that was over 30 days past due totaled $2,319,799. (Kellogg Aff. ¶ 49.) Section 7.4 of the Distribution Agreement provides that Deltec "may withhold shipments of the Products if [LGM] has not paid an invoice when due." (Distribution Agreement § 7.4.) The Distribution Agreement also provides that, irrespective of payment, Deltec, with notification, "may reject or cancel any order for any or no reason." (*Id.* § 8.1.) Thus, rather than "effectively terminating" the Distribution Agreement as LGM argues, Deltec's letter reflected the utilization of unterminated contractual provisions. As Deltec puts it, "The statement that LogiMedix would no longer be supplying Deltec supplies was simply the truth-- [Deltec] had no obligation under the Distribution Agreement to continue to ship product to LogiMedix and it was not going to do so." (Deltec's Mem. in Opp'n at 19.)

Second, LGM asserts that Deltec's March 29 letter also breached § 10 of the Distribution Agreement. (LGM's Mem. in Supp. at 9.) Under § 10, both parties agreed to comply with HIPPA as set out in Schedule 6. (Distribution Agreement § 10.) Schedule 6 provides that Deltec "may receive ... Customer Confidential Information which constitutes 'Protected Health Information' ("PHI"), as defined under the HIPPA" and that, except as otherwise provided, Deltec "may make any and all uses and disclosures of PHI received from, or created or received on behalf of, [LGM] necessary to perform its obligations under the Agreement." (*Id.* Schedule 6, § 1.) Schedule 6 also provides that "[w]ith regard to the use and/or disclosure of PHI, [Deltec] agree[d] to ... use appropriate safeguards to prevent use or disclosure of PHI other than as permitted or required by this Agreement." (*Id.* Schedule 6, § 1.2.)

LGM has not demonstrated a likelihood of success on its claim for breach of § 10. LGM contends that "DELTEC's use of 'PHI' to market and sell its products directly to LGM's patients was not 'necessary to perform its obligations" ' and breached the Distribution Agreement. (LGM's Mem. in Supp. at 9.) Other than conclusory allegations, however, LGM fails to show how Deltec's letter was "not 'necessary to perform its obligations under the Agreement." ' For example, LGM does not explain what "necessary to perform its obligations" means under the Distribution Agreement; it does not elaborate on what "PHI" Deltec supposedly misused; it does not expand on how such use of "PHI" was improper, and it does not cite a single statute, regulation, or case to support its claims that Deltec has violated HIPPA. [FN4] It is LGM's burden to show a likelihood of success and it has failed to meet that burden. Perhaps LGM will be able to muster a better argument in the later stages of this litigation, but its current showing falls short. [FN5]

FN4. Although Deltec responds that "[n]othing in HIPPA prohibits [the March 29] customer communication," and actually provides an argument complete with citations to regulations and case law (Deltec's Mem. in Opp'n at 15-19), the Court need not assess its arguments here because of LGM's insufficient showing.

FN5. At oral argument, LGM's counsel made a passing reference to § 9 of the Distribution Agreement, which defines "Confidential Information," and intimated that Deltec's March 29 letter breached that provision. Although § 9 broadly provides that "Confidential Information shall mean all information supplied by one Party to the other," there is

no obligation of confidentiality or non-use ... to information which: ... is in the public domain at the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.