IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED HEALTHCARE INSURANCE CO. and AARP,<br><br>Plaintiffs,<br><br>v.<br><br>ADVANCEPCS,[1]<br><br>Defendant. | Civil Action No. 01-CV-2320 RHK/AJB |

**MEMORANDUM OF LAW IN SUPPORT OF (1) PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS AND (2) PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS**

OPPENHEIMER WOLFF & DONNELLY LLP
Plaza VII, Suite 3300
45 South Seventh Street
Minneapolis, MN 55402
(612) 607-7000
(612) 607-7100 (fax)

WEIL, GOTSHAL & MANGES LLP
1501 K Street NW, Suite 100
Washington, DC 20005
(202) 682-7000
(202) 857-0940 (fax)
*Attorneys for Plaintiff United HealthCare Ins. Co.*

BRIOL & ASSOCIATES, PLLC
3700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 337-8410
(612) 337-5151 (fax)
*Attorneys for Plaintiff AARP*

[1] Effective March 24, 2004, AdvancePCS merged with Caremark Inc. and is now known as Caremark Inc.

On November 1, 2002, the United States Court of Appeals for the Eighth Circuit affirmed the preliminary injunction issued by this Court and held, on that record, that Defendant's conduct of surreptitiously processing AARP Program participant claims without their knowledge or consent violated the MDTPA, because such conduct was "likely to deceive AARP Program participants into believing that they received AARP services." United HealthCare Ins. Co. v. AdvancePCS, 316 F.3d 737, 743 (8th Cir. 2002). That judicial finding coupled with the undisputed facts now before the Court, including Defendant's own admissions, establish that, as a matter of law, Defendant's conduct violated, inter alia, subd. 1(1) of the MDTPA. Id. at 743-44.

Subsequent to the Court of Appeal's affirmance of the preliminary injunction, AdvancePCS filed a baseless counterclaim, charging that the inability of AdvancePCS to process claims using the H020 carrier number (either because of pharmacy blocking or the Court-ordered injunction) amounted to tortious interference and unfair competition by the Plaintiffs. These claims are not actionable as a matter of law, because, inter alia, there is no evidence that Plaintiffs engaged in any wrongful conduct – a necessary threshold for Defendant's tortious interference and unfair competition claims. Summary judgment should therefore be granted for Plaintiffs on Defendant's counterclaims.

As to Plaintiffs' claims, this Court and the Court of Appeals previously decided that Defendant's continued processing of claims without the knowledge or consent of the AARP Program participants after it was terminated as the pharmacy benefit manager ("PBM") violated the MDTPA. Rather than creating any factual issues regarding Defendant's conduct, the extensive discovery in this case only reinforces that Plaintiffs are entitled to judgment as a matter of law on their "passing off" claim and on their claims under subds. 1(2), (3), and (13) of the

MDTPA. The uncontroverted facts also establish that, as a matter of law, Defendant perpetrated its violation of the MDTPA against senior citizens (i.e., AARP Program participants) in violation of Minn. Stat. § 325F.71. Finally, undisputed facts confirm that Defendant tortiously interfered with Plaintiffs' current and prospective business relationships with AARP Program participants.

For these reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment on Defendant's counterclaims. In addition, this Court should grant Plaintiffs' Motion for Partial Summary Judgment finding that Defendant is liable on Plaintiffs' claims, leaving only the quantum of damages to be established at trial.

## THE FACTUAL RECORD[2]

After extensive discovery, the facts of this case originally before the court during the preliminary injunction hearing remain wholly undisputed. Indeed, the additional facts developed during discovery establish an even more compelling case against Defendant.

Until September 1, 2001, AdvancePCS served as the PBM to process prescription drug orders submitted to the AARP Program. See Def.'s Countercl. dated May 7, 2003 ("Countercl."). The AARP Program allows participating AARP members to obtain discounts on prescription drugs. See Countercl. at 11.

In order to access the benefits of the AARP Program, an AARP member initially presents an AARP Program identification card to his or her pharmacist, along with the prescription drug order ("claim") to be filled. See Deposition of Kevin Waite ("Waite Tr.") at 40-41 (Puls Aff. Ex. 1); see also Affidavit of Charles G. Kneese, P.D. at ¶¶ 6-8 (Puls Aff. Ex. 2). The pharmacist enters the data from the AARP Program card into his computer, thereby creating a "Patient Profile." See id. This Patient Profile contains information regarding the patient's prescription

[2] For a more complete discussion of the background of this case, see Pls.' Mem. of Law In Supp. of Their Mot. for Entry of Prelim. Inj. and Related Relief dated January 3, 2002.

drug orders such as the name and dosage of the drug, the carrier number identifying the AARP Program, the patient's unique I.D. number, and the PBM's bank identification number ("BIN"). See id.

Under the AARP Program, as administered by AdvancePCS, the AARP Program cards bore the carrier number H020 and a unique participant I.D. number assigned by the AARP Program, which together identified the card holder as an AARP Program participant, eligible for AARP Program discounts. Countercl. at 3. While AdvancePCS was the PBM for the AARP Program, these cards also included AdvancePCS's BIN. See Countercl. at 4. Using the BIN as the routing number, the pharmacist could electronically transmit Patient Profile and prescription information to AdvancePCS for processing. See id. at 4; see also Deposition of Todd Guinn ("Guinn Tr.") at 68-69 (Puls Aff. Ex. 3); Waite Tr. at 45-46 (Puls Aff. Ex.1). AdvancePCS would process the claim by confirming the participant's eligibility for the AARP Program and electronically notifying the pharmacist of the discounted price to charge the AARP Program participant for the drug. Each time AdvancePCS processed a claim at a price other than "Usual and Customary," it received a fee. See Deposition of Brian Correia ("Correia Tr.") at 120, 205-06 (Affidavit of Bret A. Puls ("Puls Aff.") Ex. 4).[3]

A key component of the AARP Program is known as Drug Utilization Review ("DUR"), a process that is intended to prevent harmful drug interactions. Each time a participant fills a prescription under the AARP Program, the PBM updates his or her prescription history and runs this information through the DUR process. If the DUR indicates that the drug may be inappropriate, for example, by identifying the possibility of a harmful drug interaction with

[3] During the relevant period, roughly 14% of the claims processed through the AARP Program were processed at "Usual & Customary." See Deposition of Sandra Mead ("Mead Tr.") at 72 (Puls Aff. Ex. 5) and Exhibit 416 (UHIC 1757-62) (Puls Aff. Ex. 6).

previously-obtained prescription drugs, the PBM alerts the pharmacist.[4]

Pharmacists customarily do not require AARP Program participants to show their discount cards each time they return to the pharmacy to refill an existing prescription or fill a new one. See Correia Tr. at 171-73 (Puls Aff. Ex.4). Nor do patients typically offer to show their card during subsequent visits. See Waite Tr. at 42-43 (Puls Aff. Ex.1). Instead, once the Patient Profile has been saved in a pharmacy computer, patients obtain refills on prescriptions without showing a card, whether they request a refill in person, by phone, or over the internet. Id.; see also Correia Tr. at 171-73 (Puls Aff. Ex. 1). This is true whether the card is an "unfunded" discount card or a "funded" insurance card. See id. at 173-75 (Puls Aff. Ex.1).

The pharmacist would normally only ask to see a patient's discount card after the initial visit if the PBM rejected or otherwise refused to process a subsequent claim for that patient. See Deposition of Charles Kneese ("Kneese Tr.") at 87-88 (Puls Aff. Ex. 7); see also Deposition of Jeffrey Sanders ("Sanders Tr.") at 80 (Puls Aff. Ex. 8). Only a rejection from the PBM would prompt the pharmacist to ask if the patient had a new card, or if any of the patient's information had changed. Id. Pharmacists rely on PBMs to alert them to any changes relating to specific carrier-group numbers, BINs, or a participant's eligibility by the use of rejection codes. See Waite Tr. at 51-52 (Puls Aff. Ex.1); see also Deposition of Bob Dufour ("Dufour Tr.") at 170-72 (Puls Aff. Ex. 9); Deposition of Thomas Morrison ("Morrison Tr.") at 156-57 (Puls Aff. Ex. 10).

In April 2001, AARP selected United to assume operational responsibility for the AARP Program. Countercl. at 13. United then decided to terminate AdvancePCS as the PBM for the

---

[4] The prescription history of individual AARP Program participants is owned by the AARP Program, not by the PBM. Because AARP Program participants may fill prescriptions at a multitude of pharmacies (and because the prescriptions themselves may have been obtained from several different doctors), the AARP Program's DUR system includes the most comprehensive – and therefore most effective – record of prescription drugs taken by AARP Program participants. As a result, there is no adequate substitute for this service to safeguard the health and welfare of AARP Program participants.

AARP Program and selected Express Scripts Inc. ("ESI") as its replacement. See id. The termination was effective September 1, 2001. See id.

Prior to September 1, 2001, AdvancePCS decided to reuse, for its own competing cash card program, the H020 carrier number that had been assigned to the AARP Program. See Deposition of Patrick Kenney ("Kenney Tr.") at 191 (Puls Aff. Ex. 11); see also Deposition of Kirby Bessant ("Bessant Tr.") at 211 (Puls Aff. Ex. 12). For this competing program, AdvancePCS also chose to do away with any eligibility screening, so that any claim referencing H020 would be automatically processed by AdvancePCS, whether or not the patient chose AdvancePCS's card program. See Deposition of Jacqueline Brown ("Brown Tr.") at Ex. 10 (Puls Aff. Ex. 13); see also Kenney Tr. at 87-89 (Puls Aff. Ex.11). On September 1, 2001, the same day AdvancePCS's termination as the PBM for the AARP Program took effect, AdvancePCS quietly launched its own "open membership" or "open enrollment" prescription drug discount card program, called the "AdvancePCS Prescription Plan" or the "AdvancePCS Rx Savings Plan." Countercl. at 14; see also Bessant Tr. at 209-10 (Puls Aff. Ex.12); Guinn Tr. at 108-09, 159-61 (Puls Aff. Ex.3).

Defendant was aware that the novel structure it created for its new competing cash card program would result in AARP Program participants' claims intended for the AARP Program being processed under AdvancePCS's Plan without the consent or knowledge of the AARP members. See Kenney Tr. at 107-08; see also Bessant Tr. at 217-18. In fact, to further the intentional diversion of AARP claims, Defendant intentionally concealed its decision to reuse the H020 carrier number from Plaintiffs and ESI through a series of affirmative misrepresentations and material omissions. See Kenney Tr. at 229-30, 240-41; see also Deposition of Marjorie Simos ("Simos Tr.") at 85 (Puls Aff. Ex. 14); Bessant Tr. at 244, 250 (Puls Aff. Ex. 12).

As a result of AdvancePCS's intentional acts, countless AARP Program participants were unknowingly diverted to the AdvancePCS Plan on and after September 1, 2001, such that the Plaintiffs lost approximately 60% of the expected claim volume for the AARP Program. See Deposition of Mark Lindsay ("Lindsay Tr.") at 124 (Puls Aff. Ex. 15). Importantly, Defendant continued to receive a per claim fee for each of the diverted claims not processed at the "Usual & Customary" price. See Kenney Tr. at 51-52 (Puls Aff. Ex.11); see also Correia Tr. at 120 (Puls Aff. Ex.4).

In response to Defendant's actions, Plaintiffs alerted participating pharmacies to the claim diversions, requested their assistance in resolving the problem, and sought a preliminary injunction against further diversion. The preliminary injunction was granted by this Court, United HealthCare Ins. Co. v. AdvancePCS, No. Civ. 01-2320, 2002 U.S. Dist. LEXIS 4676 (D. Minn. Mar. 18, 2002), and affirmed on appeal, United HealthCare Ins. Co. v. AdvancePCS, 316 F.3d 737 (8th Cir. 2002) (See Affidavit of David Prange "Prange Aff." at Ex. A).

**ARGUMENT**

Summary judgment is appropriate for disposing of claims or defenses that are either based on undisputed facts or factually unsupported. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Hegg v. United States, 817 F.2d 1328, 1331 (8th Cir. 1987). To defeat a motion for summary judgment, the non-moving party must show through specific evidence that there are material facts in dispute creating a genuine issue for trial; it may not rest only upon the allegations or denials of its pleadings. See Celotex Corp., 477 U.S. at 327. "If the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial.'" St. Jude Medical, Inc. v. Lifecare Int'l, Inc., 250 F.3d 587, 595 (8th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 323). Accordingly, this Court may grant a motion for summary judgment when it determines "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## I. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON ADVANCEPCS'S COUNTERCLAIMS

AdvancePCS's counterclaims for tortious interference and unfair competition are predicated entirely on the allegation that, months after September 1, 2001, AdvancePCS was wrongfully blocked by pharmacies from continuing to process claims using the H020 carrier number.[5] However, AdvancePCS has not and cannot present any evidence establishing that the Plaintiffs acted wrongfully in responding to its surreptitious diversion of claims from the AARP Program to the AdvancePCS Plan. Nor has AdvancePCS shown injury to any protectable commercial interest. By improperly reusing the H020 carrier number, AdvancePCS was solely responsible for mixing any purportedly legitimate AdvancePCS business in with claims to which it had no entitlement. AdvancePCS compounded this problem by failing to provide anyone with information – of which it alone had knowledge – that would have minimized or eliminated the impact of an H020 block on legitimate AdvancePCS business. Accordingly, the Court should grant summary judgment in favor of United and AARP and dismiss AdvancePCS's Counterclaims with prejudice.[6]

---

[5] AdvancePCS's counterclaims allege in part as follows: "By engaging in the wrongful conduct described above, including but not limited to, mandating that pharmacies reject all claims directed to the AdvancePCS Plan, encouraging pharmacists to alter patient information to remove references or identifiers to the AdvancePCS Plan, and taking steps to destroy the AdvancePCS Plan, United and AARP acted unlawfully and engaged in unfair competition in violation of the law." Countercl. at 17. "By engaging in the conduct described above, including interference with the processing of claims by pharmacies, AARP and United intentionally interfered with AdvancePCS's prospective contracts with pharmacies and prospective economic advantage." Countercl. at 18.

[6] The Court denied Plaintiffs' motion to dismiss Count II (unfair competition) of AdvancePCS's Counterclaim in May 2003, noting that the summary judgment stage of the case, "when the facts will be more developed," was a

## A. Defendant's Tortious Interference Claim Requires A Wrongful Act

As this Court has noted, "[u]nder Minnesota law, 'unfair competition is not a tort with specific elements; it describes a general category of torts which courts recognize for the protection of commercial interests.' Torts included under the unfair competition umbrella include improper use of trade secrets and tortious interference with contract, among others." United HealthCare Insurance Co. and AARP v. AdvancePCS, 2003 U.S. Dist. LEXIS 17920, at *17 (D. Minn. Oct. 6, 2003) (citations omitted) (Prange Aff. Ex. B); see also Lenscrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1490 (D. Minn. 1996). Under Minnesota law, "[t]o establish a claim for tortious interference with prospective business relations, a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship." Hunt v. University of Minn., 465 N.W.2d 88, 95 (Minn. Ct. App. 1991) (citing United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982)).[7]

Minnesota law requires AdvancePCS to make a threshold showing that Plaintiffs' conduct be wrongful before liability for tortious interference or unfair competition attaches. See e.g., Fox Sports Net North LLC v. Minnesota Twins P'ship, 319 F.3d 329, 337 (8th Cir. 2003) ("Liability for unfair competition claims only attaches where the actor's conduct is improper."); R.A., Inc. v. Anheuser-Busch, Inc., 556 N.W.2d 567, 571 (Minn. Ct. App. 1996) ("The law clearly requires the actor's conduct to be improper before liability for interference with

---

more appropriate time to consider the issue of whether "the legal elements of AdvancePCS's unfair competition claim are necessarily subsumed within the requirements of tortious interference." United HealthCare, 2003 U.S. Dist. LEXIS 17920 at *18 (Prange Aff. Ex. B). Having had the opportunity to develop facts supporting its claims, AdvancePCS has failed to carry its burden to show distinct causes of action against the Plaintiffs. In the event the Court does not dismiss AdvancePCS's counterclaims in their entirety, at a minimum, Count II should now be dismissed.

[7] Factors to consider in determining whether conduct is improper include: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. Restatement (Second) of Torts § 767; see also Northside Mercury Sales & Serv. v. Ford Motor Co., 871 F.2d 758, 761 (8th Cir. 1989).

prospective contractual relations will attach."). AdvancePCS has failed to satisfy its burden of proof to show that the Plaintiffs "intentionally committed a wrongful act which improperly interfered" with some prospective business relationship. Hunt., 465 N.W.2d at 95.

## B. Plaintiffs Did Not Commit Any Wrongful Acts

AdvancePCS has not established that Plaintiffs did anything wrongful, and cannot do so in light of this Court's decision to enjoin AdvancePCS from continuing to use the H020 carrier number. Plaintiffs acted reasonably to stop AdvancePCS's deliberate, calculated claim diversion, to protect their legitimate business interests as well as the interests and physical well-being of AARP members who were deprived, without their consent or knowledge, of the prescription drug discounts and DUR benefits.

Upon learning of the claim diversion, Wal-Mart and many other pharmacies also took action in the days following the September 1, 2001 transition to stop AdvancePCS from processing claims using the H020 carrier number:

Q. . . . . My question was, did you have the impression that these pharmacists, Wal-Mart, Stop and Shop, Rite-Aid, did not want to block the H020 claims being processed through the AdvancePCS program, even though they actually communicated to you that they, in fact, wanted to block those claims?
A. I got the impression that word was coming down from the top that they wanted a block put in place regardless of what they felt about the program.
Q. "The top" meaning who?
A. Senior management.
Q. Of senior management of those pharmacies?
A. True, right. Someone maybe possibly above Bob Dufour's level or Bob Stone's level, the people I typically deal with.
Q. So you weren't told of any threats or coercion by ESI, were you?
A. Not specifically. And I don't want you to misinterpret when I said pressure meaning violent or physical acts; it was just a lot of energy around that topic.
Q. Did you ever hear that United Healthcare was pressuring any pharmacists to block H020 claims from being processed by AdvancePCS after September 1st, 2001?
A. No, not to my knowledge.

Correia Tr. at 295-96; see also Correia Tr. at 279-80 (Puls Aff. Ex. 4) and Ex. 8 (APCS 010279-

80) (email from Stop & Shop pharmacy chain to AdvancePCS demanding that AdvancePCS stop adjudicating AARP Program claims) (Puls Aff. Ex. 16); Correia Tr. at 286-90 (Rite-Aid contacted AdvancePCS saying it would block claims) (Puls Aff. Ex.4).

Moreover, AdvancePCS does not take the position that it was illegal or wrongful for those pharmacies to block or reprofile to recover diverted AARP Program claims. See Kenney Tr. at 359 (Puls Aff. Ex.11); see also Guinn Tr. at 275-76 (Puls Aff. Ex.3). In fact, Todd Guinn, the Assistant Vice President of Pharmacy Network Development at AdvancePCS, testified during his deposition that he instructed Wal-Mart on how to block AARP Program claims from being transmitted to AdvancePCS:

> Q. At that conversation in September of 2001, Mr. Dufour told you that he was going to find a way to block what PCS was doing, right?
> A. Yes. And I basically told him how to do it.
> Q. You told him how to achieve that block?
> A. Yeah.
> Q. What did you tell him?
> A. Block the carrier number.
> Q. You told him to go ahead and do that?
> A. I said if you need to -- that's what you need to do, block the carrier number.
> Q. That was something appropriate for Mr. Dufour to do?
> A. He had that capability.
> Q. And you told him to do it, right?
> A. I suggested that's what he should do if he wants to stop sending any of those claims to AdvancePCS, I said perform that block.

Guinn Tr. at 263-64 (Puls Aff. Ex.3); see also Guinn Tr. at 275-76 (noting that he was not surprised that pharmacies were blocking because "that was really their only recourse in that particular matter.") and 245-46 (complaining that Wal-Mart wanted AdvancePCS to block the claims, "rather than just looking at it and doing it themselves, which is . . . what they should have done to begin with.") (Puls Aff. Ex.3). In light of Mr. Guinn's testimony, Defendant cannot maintain that what it once considered appropriate is now somehow wrongful. To the contrary, Defendant's (i) knowledge of pharmacies' intention to block, (ii) direction to pharmacies to carry

out the blocks, and (iii) decision to instruct pharmacies on how to block establishes, as a matter of law, that Plaintiffs have not committed any wrongful acts.[8]

In any case, the actions of the pharmacies were ratified by this Court when it ordered the preliminary injunction which precluded AdvancePCS from processing claims submitted under H020. As such, any alleged interference in this regard cannot be considered wrongful. The issuance of an injunction cannot form the basis for a cause of action for tortious interference or unfair competition. See e.g., Steller v. Thomas, 45 N.W.2d 537, 544 (Minn. 1950). To the extent that AdvancePCS asserts that the injunction itself is a basis for AdvancePCS's counterclaims, see Countercl. at 49, AdvancePCS has not carried its burden to show that this injunction was improperly entered. Even if AdvancePCS were able to prove that the injunction was improper, which it cannot do, the appropriate remedy would be collection on the bond, not an action for damages.[9]

### C. AdvancePCS Has Failed To Establish That It Lost Legitimate Business

[8] It is undisputed that many pharmacies voluntarily chose to block AdvancePCS from processing claims using the H020 carrier number. With regard to Wal-Mart, one of the country's largest pharmacy chains, the decision to block was clearly Wal-Mart's alone:

Q. Okay. But did you feel that you were being, you know, pushed to block --
A. No, not at all. No.
Q. -- by Express Scripts or United?
A. No.
Q. So you didn't feel that they were trying to coerce you into --
A. No. When we understood what was going on, I – I know I felt exactly the same way as what I told you earlier, that this was not the way we wanted to do business, because from our standpoint, the biggest concern was the consumers we were serving were not aware, in my opinion, that they were getting their prescriptions transmitted to a -- to a card program that they had never signed up for and they weren't aware of.
Q. Okay.
A. That was a concern of mine.
Q. Okay. So were you -- Did anybody offer you any financial incentives to block?
A. Not -- not that I know of.
Q. Okay. So you feel this was, you know, your decision, Wal-Mart's decision. It wasn't one that was thrust on you by any other third party.
A. No. It was Wal-Mart's decision.

Dufour Tr. at 96-97 (Puls Aff. Ex 9).

[9] See e.g., Steller, 45 N.W.2d at 544 ("It is well settled that damages caused by an injunction improvidently granted cannot be recovered by a defendant from the injunction plaintiff independently of the bond or undertaking unless the injunction suit was maliciously instituted without probable cause.").

AdvancePCS additionally has failed to carry its burden of establishing that legitimate AdvancePCS claims were lost through blocking or reprofiling. There is no evidence that claims of people who voluntarily agreed to participate in the AdvancePCS Plan were diverted to ESI or blocked from reaching AdvancePCS.[10] As a result, there is no evidence supporting AdvancePCS's allegation that blocking activities caused it to lose legitimate claims.[11]

### D. AdvancePCS's Own Actions Bar Any Recovery

As this Court observed in granting the preliminary injunction, "any harm AdvancePCS may suffer due to claim rejections stems directly from AdvancePCS's decision to deviate from standard conventions in the pharmacy industry and to continue processing claims submitted under carrier and group numbers associated with a program for which it was no longer the PBM." United HealthCare, 2002 U.S. Dist. LEXIS 4676, at *52 (Prange Aff. Ex. A).

AdvancePCS's 30(b)(6) damages witness, Mr. Kenney, freely admits that AdvancePCS could always have used a different carrier number for its new business under the AdvancePCS Plan. See Kenney Tr. 363-64. Thus, AdvancePCS knowingly created the situation by which pharmacies and this Court could not distinguish between claims submitted under the AARP Program and claims allegedly meant for the AdvancePCS Plan. Because of this, AdvancePCS must itself bear the burden of any injuries flowing from its wrongful actions. As the United States Court of Appeals for the Eighth Circuit has stated: "'Ex dolo malo non oritur actio'" is a

[10] The record does not reflect whether any non-AARP Program participants were, in fact, incorrectly sent to ESI for processing because of the implementation of blocks by pharmacies. Importantly, "[t]he mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations under Minnesota law." International Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1405 (8th Cir. 1993).

[11] Contrary to Defendant's unsupported allegations, the only evidence in the record regarding AdvancePCS's allegation that Plaintiffs caused AdvancePCS to lose claims comes from the testimony of Beth Wingate, Vice President of Provider Relations at ESI. Ms. Wingate testified that, because of the risk that AdvancePCS might have assigned H020 to new, legitimate business, the blocks would not automatically route H020 claims to ESI, but instead would prompt pharmacies to ask their patients to confirm the program they wished to use before routing the claim for processing. Deposition of Elizabeth Wingate ("Wingate Tr.") at 77-81 (Puls Aff. Ex. 17).

maxim which lies at the foundation of a general rule of public policy, the rule that the courts will not sustain an action which arises out of the moral turpitude of the plaintiff or out of his violation of a general law enacted to carry into effect the public policy of the state or nation." Levy v. Kansas City, Kan., 168 F. 524, 525 (8th Cir. 1909).

In addition to refusing to assist the Plaintiffs and chain pharmacists in their efforts to restore the AARP Program claim volumes, it is undisputed that AdvancePCS withheld from everyone information that could have prevented any collateral effect of blocking on legitimate AdvancePCS business. See Kenney Tr. at 355-56 (testifying that AdvancePCS had the ability to track how members enrolled in the AdvancePCS Plan, that such information could have been used to shield legitimate AdvancePCS claims from blocking efforts, and, to his knowledge, that information was not given to Plaintiffs) (Puls Aff. Ex.11). As this Court recognized over two years ago:

> By the Third Affidavit of Kirby Bessant, AdvancePCS has demonstrated that it can identify those customers who have enrolled voluntarily into the AdvancePCS program (as opposed to "through the adjudication of a claim using the former AARP Program carrier-group numbers") and the route through which they became enrolled (physician versus pharmacist versus direct). If AdvancePCS can identify those customers for purposes of its motion to the Court, it stands to reason that AdvancePCS can identify those customers for purposes of transmitting a message to pharmacists that prompts them – in response to the rejection of a discount claim – to call AdvancePCS and obtain new carrier and group numbers for submitting the claim. AdvancePCS bears the burden of establishing how these 9,350 voluntary participants would be "displaced" or how AdvancePCS would be foreclosed "from providing the benefits of the AdvancePCS Plan" barring a stay of the injunction. AdvancePCS has failed to meet that burden.

United HealthCare Ins. Co. v. AdvancePCS, Civ. No. 01-2320, 2002 U.S. Dist. LEXIS 6011, at *11-12 (D. Minn. Mar. 22, 2002) (Prange Aff. Ex C).

Since the issuance of the injunction against AdvancePCS, this Court's conclusions have been bolstered by documents and testimony obtained through discovery. AdvancePCS has

always had the information necessary to allow this Court, and any pharmacies seeking to block diverted claims, to carve out the group numbers assigned to AdvancePCS's purportedly legitimate business. See Kenney Tr. at 355-56 (Puls Aff. Ex.11). AdvancePCS chose not do this, and in at least one significant instance, advised that any blocking should be done at the carrier group level, with no directions to carve out any bona fide AdvancePCS claims. See Guinn Tr. at 263-64 (Puls Aff. Ex.3).[12] AdvancePCS therefore had the ability, from the beginning, to avoid any alleged injury to its new program by adopting legitimate methods of launching it. For these reasons, AdvancePCS is barred from recovering any damages relating to its counterclaims.

## II. PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO LIABILITY ON THEIR CLAIMS AGAINST ADVANCEPCS[13]

### A. AdvancePCS Violated The MDTPA

The MDTPA provides that "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

> (1) passes off goods or services as those of another;
> (2) causes a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another; or
>
> ....
>
> (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

Minn. Stat. § 325D.44, subd. 1. In order to prevail in an action under the MDTPA, "a

---

[12] Moreover, United specifically asked AdvancePCS's general counsel to identify those individuals alleged to have voluntarily signed up for the AdvancePCS Plan, but never received the requested information. See Lindsay Tr. at 186-89 (Puls Aff. Ex. 15).

[13] Plaintiffs' motion for summary judgment on their claims requests partial summary judgment establishing Defendant's liability for violating the MDTPA and its the senior citizen provision, and for committing tortious interference. If summary judgment is granted, Plaintiffs anticipate that the quantum of damages will be the only question left for trial. See Antioch Co. v. Scrapbook Borders, Inc., 291 F. Supp. 2d 980, 985 (D. Minn. 2003) (holding "that a less than full adjudication is permissible, and especially so, on the issue of liability, while leaving the issue of damages for Trial. Rule 56 plainly contemplates such a course of action.")

complainant need not prove competition between the parties or actual confusion or misunderstanding." Id. at subd. 2.

### 1. Defendant "Passed Off" The AdvancePCS Program As The AARP Program

By processing claims intended for the AARP Program without the consent of AARP Program participants, AdvancePCS "passed off" its AdvancePCS Plan as the AARP Program in violation of MDTPA subd. 1(1). Minnesota law defines "passing off" as conduct that "deceives, or is likely to deceive, a customer exercising ordinary care in the making of a purchase of the particular goods, and induces him to purchase defendant's goods in the belief they are those of plaintiff." United HealthCare Ins. Co. v. AdvancePCS, 316 F.3d 737, 743 (8th Cir. 2002) (citing Winston & Newell Co. v. Piggly Wiggly Northwest, 22 N.W.2d 11, 16 (Minn. 1946)). Importantly, the Court of Appeals recognized that evidence of causation is not required to establish a "passing off" violation, stating, "[n]either proof that AdvancePCS caused the confusion nor affirmative misrepresentations are required to prove 'passing off' under the MDTPA." United HealthCare, 316 F.3d at 743.[14]

Both this Court and the Court of Appeals have already condemned Defendant's actions as "passing off" under the MDTPA. As this Court noted:

> From the perspective of the AARP Program participant, who apparently has no knowledge that he or she [sic] as been 'enrolled' in AdvancePCS's program, the Defendant's conduct has the probable tendency and effect of deceiving those AARP members into believing that the discount they received on their prescription, and the DUR performed for the pharmacist before the prescription was filled, were done through the AARP Program. On the record presently before the Court, there is a clear likelihood of success on the merits of a "passing off"

[14] Therefore, any facts, issues or arguments related to whether Plaintiffs contributed to the confusion by failing to adequately inform members of the change in PBM's are immaterial and irrelevant. See United HealthCare, 316 F.3d at 743 ("[A]ssuming arguendo that United and AARP created the opportunity for customer confusion through their post-termination conduct, AdvancePCS is still liable for failing to take reasonable precautions to prevent customer confusion with the pre-existing product.")

claim.

United HealthCare, 2002 U.S. Dist. LEXIS 4676 at *36 (Prange Aff. Ex. A). The Court of Appeals concurred:

> [w]e also agree with the district court that AdvancePCS's conduct, processing Program participants' claims using codes numbers issued to them before September 1 without obtaining their consent, is likely to deceive AARP Program participants into believing that they received AARP services.

United HealthCare, 316 F.3d at 743. The decisions of this Court and the Court of Appeals that Defendant's conduct constituted "passing off" under the MDTPA rest on a factual record that today stands uncontroverted. Rather than creating any material issues of fact, subsequent discovery in this case reinforces that Defendant's conduct falls squarely within the parameters of a "passing off" claim as a matter of law. See Kenney Tr. at 87-89, 107-08, 168-69 (Puls Aff. Ex.11); see also Bessant Tr. at 217-18 (Puls Aff. Ex.12); Guinn Tr. at 143-44 (Puls Aff. Ex.3).

The Court of Appeals also found that Defendant's conduct was likely to confuse and deceive AARP Program participants into believing that they received AARP Program services when in fact their prescription claims had been processed under the Advance PCS Plan:

> [g]iven the surreptitious manner in which AdvancePCS processed the AARP Program participants' claims and the undisputed evidence indicating pharmacist confusion, we hold that the district court did not clearly err in finding that customers were likely to be confused.

United HealthCare, 316 F.3d at 744. The critical fact that remains uncontroverted is that Defendant processed claims intended for the AARP Program under the AdvancePCS Plan without obtaining the consent of the AARP Program participants. Based on this record, the Court of Appeals succinctly concluded: "[Defendant] created the likelihood of confusion here by silently processing AARP Program participants' claims without obtaining explicit consent first." United HealthCare, 316 F.3d at 744.

The factual record developed through discovery also contains uncontradicted testimony from pharmacists that Defendant's conduct created not just a likelihood of confusion, but also actual confusion among pharmacists and AARP members attempting to use or access the AARP Program. For example, after September 1, 2001, representatives of two of the largest pharmacy chains, Wal-Mart and CVS, alerted Defendant to the confusion and deceit associated with reuse of the H020 carrier number. Bob Dufour, Director of Professional Services for Wal-Mart Pharmacies, confirmed Defendant's deception of AARP Program participants and deviation from pharmacists' expectations:

> A. It wasn't conforming with industry standards, but it was also deceiving -- deceiving to the customers that Wal-Mart was serving, because these customers had signed up for an AARP card and, in fact, were now being processed under some other card they never signed up for, and as I said before, not only were they not aware of it, I believe that many of our pharmacists were not aware of it.

Dufour Tr. at 86-87 (Puls Aff. Ex.9). Thomas Morrison, Vice-President of Pharmacy Services for CVS Pharmacies, echoed Mr. Dufour's opinion on the effect of Defendant's conduct:

> A. In hindsight I think it was out of the ordinary for the steps that were taken by AdvancePCS. I think it was confusing to our pharmacies. It was confusing to the member. It was mismarketing. The members may have perceived that they were obtaining a prescription under the AARP Program and in fact they were not. So, I thought in hindsight my personal belief is that it wasn't handled very well by AdvancePCS.

Morrison Tr. at 176; see also Deposition of Mary Ellen Mitchell ("Mitchell Tr.") at 137-39 (Puls Aff. Ex. 18); Dufour Tr. at 142-44; Puls Aff. Ex. 10), APCS 00701 (Puls Aff. Ex. 19) (noting that "[n]ot receiving standard group termination reject and messaging has driven greater call volume to Help Desk than would normally be seen with a large group termination."). Similarly, Bob Stone from the Stop & Shop pharmacy chain sent an e-mail to AdvancePCS explaining that his pharmacy had "received a letter from a customer who is irate because one of our stores processed an AARP-discounted prescription through PCS instead of Express." Correia Tr. at

279-80 (Puls Aff. Ex. 4)and Ex. 8 (APCS 010280) (Puls Aff. Ex. 16).[15] Accordingly, it is undisputed that Defendant's conduct in processing claims intended for the AARP Program without first obtaining the consent of the AARP Program participants caused a likelihood of confusion and constituted "passing off" under the MDTPA.

### 2. AdvancePCS Also Violated MDTPA Subds. 1(2), (3), And (13)

Under subparts (2) and (3) of subdivision 1 of the MDTPA, a deceptive trade practice includes conduct that gives rise to a likelihood of confusion or misunderstanding as to either (a) the defendant's affiliation, connection, or association with another, or (b) the sponsorship or approval by another of the person's goods or services. See Minn. Stat. § 325D.44, subd. 1(2) and (3). To establish liability under the MDTPA, Plaintiffs need not prove competition between the parties or actual confusion or misunderstanding. See Minn. Stat. § 325D.44, subd. (2). Proof of a mere likelihood of confusion or misunderstanding is sufficient. See Claybourne v. Imsland, 414 N.W.2d 449, 451 (Minn. Ct. App. 1987).

It is undisputed that Defendant's conduct in surreptitiously processing claims intended for the AARP Program resulted in a likelihood of and actual confusion among pharmacists and patients attempting to use the AARP Program. See supra Part II(A). Likewise, it is equally uncontroverted that Defendant's conduct caused confusion regarding AdvancePCS's affiliation, connection or association with the AARP Program by: (1) deviating from pharmacists' expectations and (2) not rejecting H020 claims but rather accepting and processing claims intended for the AARP Program under the AdvancePCS Plan.

---

[15] A likelihood of confusion is also evidenced by what was not available to patients on the launch date of the AdvancePCS Plan: no member identification cards, no direct-to-consumer marketing, no brochures, no informational materials for pharmacists or doctors, no pharmacy displays, no website, and no call centers to sign up patients. See Kenney Tr. at 104-05, 290-91 (Puls Aff. Ex 11); see also Correia Tr. at 321-23, 339-41 (Puls Aff. Ex. 4). These basic services and materials were not made available until approximately two months after the September 1, 2001 "launch" date, making it highly unlikely that, on September 1, 2001, any AARP Program participant would have knowingly chosen to participate in the AdvancePCS Plan.

Pharmacists expected Defendant to issue a rejection when a claim intended for the AARP Program was sent to it after September 1, 2001 because AdvancePCS was no longer the PBM for that program. For example, Mr. Dufour of Wal-Mart Pharmacies testified:

> Q. Okay. And you were expecting -- You expect that whether it's a consumer card or a funded card, that there's going to be -- the PBM that's terminated will reject the claims.
> A. Yes.

Dufour Tr. at 110; see also Dufour Tr. at 47, 62, 111 (Puls Aff. Ex. 9). Ms. Mitchell of CVS Pharmacies also confirmed that pharmacists expect a reject code from the old PBM when a plan has been transitioned to a new PBM. Mitchell Tr. at 114-15 (stating that the previous PBM would reject claims post-transition) (Puls Aff. Ex.18). Charles Kneese, Senior Director of Network Relations at ESI expressed disbelief that Defendant would not issue a reject message:

> Q. Is it your testimony that a new PBM could not effectively transition a program from a former PBM without the rejection notice?
> A. I have never seen a program until this one where there was not a reject notice that was passed back. This is the first time in my experience where I had seen this happen.

Kneese Tr. at 53-54 (Puls Aff. Ex.7). Finally, Kevin Waite, Defendant's own Director of Network Development even testified that:

> Q. Based on your experience as a pharmacist after September 1st, would -- if AdvancePCS was being terminated as the PBM for the AARP program, do you think that pharmacists expected to receive a rejection message when it input a claim under the prior profile information?
> A. I think that would be the normal expectation, yeah.
> Q. And do you believe that pharmacists would have expected to receive the message "plan" -- I'm not exactly sure of the language, "plan not" –
> A. "Plan terminated."
> Q. "Plan terminated"?
> A. Yeah, something to that effect would be the norm.
> Q. Why do you think that pharmacists would have expected that rejection message?
> A. That's normal practice in -- with the online transaction environment, because it is real-time and there's not -- there's the ability to do that. It's expected as a way to help the pharmacy -- prompt the pharmacy to seek new coverage, or whatever the case may be.

Waite Tr. at 102-03 (Puls Aff. Ex.1).

The testimony cited above fully supports the findings of this Court on the preliminary injunction:

> [T]hat AdvancePCS's conduct is contrary to standard practices in the pharmacy industry, according to which a company that no longer administers a prescription drug program "turns off" its carrier number and rejects claims submitted under that number.

United HealthCare, 2002 LEXIS 4676 at *39-40 (internal footnotes omitted) (Prange Aff. Ex. A). The uncontroverted record also confirms that the rejection of claims by a terminated PBM is the pivotal step in claims processing. See Dufour Tr. at 107 (Puls Aff. Ex. 9); see also Mitchell Tr. at 18-20 (Puls Aff. Ex. 18); Waite Tr. at 51-52 (Puls Aff. Ex.1). Since it is undisputed that actual confusion resulted from AdvancePCS's conduct (i.e., reusing H020 and failing to reject claims), summary judgment is appropriate.

### B. Defendant Directed Its Deceptive Conduct Towards Senior Citizens

The undisputed evidence in this case establishes that Defendant violated the MDTPA (see supra Part II(A)) and that Defendant knew that its conduct was directed at senior citizen participants in the AARP Program. Minnesota Statutes section 325.71 provides for a supplemental civil penalty against persons who engage in conduct prohibited by the MDTPA and whose deceptive conduct has been perpetrated against one or more senior citizens – i.e., individuals who are age 62 or over. See Minn. Stat. § 325F.71, subds. 1(a) and 2(a); see also Hollywood Healthcare Corp. v. Deltec, Inc., 2004 WL 1118610, at *7 (D. Minn. May 17, 2004) (Prange Aff. Ex. D). In determining whether to impose a civil penalty, and in what amount, section 325.71 directs that the court consider a number of factors, including "whether the defendant knew or should have known that the defendant's conduct was directed to one or more

senior citizens…" Minn. Stat. § 325F.71, subd. 2(b)(1). In addition, section 325F.71 provides that "[a] person injured by a violation of this section may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorneys' fees, and receive other equitable relief as determined by the court." Minn. Stat. § 325F.71, subd. 4.

This Court has already ruled that under the plain language of the statute United and AARP qualify as persons "injured by a violation of this section" and therefore have standing to bring this action and to recover damages. United HealthCare, 2002 U.S. Dist. LEXIS 4676 at *46-47. It is undisputed that the majority of AARP Program participants are senior citizens and that Defendant was fully aware of that fact. Bessant Tr. at 149. In a memorandum to Kirby Bessant, Patrick Kenney noted that the average age of participants in the AARP Program was over seventy (70) years old. Kenney Tr. at 40-41 and Ex. 11 (APCS 06273) (Puls Aff. Ex. 20).

Senior citizens in the AARP Program were injured by being deceived into participating in the AdvancePCS Plan without their consent, depriving them of the prescription drug discount and DUR benefits they expected to receive under the AARP Program. Plaintiff United was injured by the MDTPA violation because it could not process and collect processing fees for the claims of the AARP Program participants that were diverted to AdvancePCS, as contemplated by the exclusive contract United had with AARP to provide prescription drug discount services. See Deposition of Lois Quam (Quam Tr.") at 121-152 (Puls Aff. Ex. 21). Plaintiff AARP was injured because it was unable to protect the interests of AARP members who were unknowingly diverted into the AdvancePCS Plan, and because it was unable to provide AARP Program participants the prescription drug discount and DUR benefits they would have received under the AARP Program. Accordingly, as a matter of law, the Defendant is liable for a supplemental civil

penalty under section 325F.71 and Plaintiffs United and AARP are entitled to recover damages.

### C. Defendant Tortiously Interfered With Plaintiffs' Prospective Business Relationship With AARP Program Participants

Under Minnesota law, "[t]o establish a claim for tortious interference with prospective business relations, a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship." Hunt v. University of Minn., 465 N.W.2d 88, 95 (Minn. Ct. App. 1991) (citing United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982)). "[O]ne intentionally interferes and improperly interferes with another's prospective business relationship by (1) inducing a third person not to enter into or to continue the prospective relation, or (2) preventing the other from continuing the prospective relationship." Hough Transit, Ltd. v. National Farmers Org., 472 N.W.2d 358, 361 (Minn. Ct. App. 1991) (citing United Wild Rice, Inc., 313 N.W.2d at 632-33).

#### 1. Defendant Intentionally Engaged In Wrongful Conduct

As discussed, the uncontroverted evidence in this case supports the earlier findings of this Court and the Court of Appeals by firmly establishing that Defendant "passed off" the AdvancePCS Plan without the consent of patients attempting to use the AARP Program and in violation of the MDTPA. The violation of a statutory duty constitutes wrongful conduct for purposes of tortious interference. See Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. P'ship., 977 F. Supp. 1386, 1394 (D. Minn. 1997) ("To the extent that it is established, as alleged, that Defendant was in violation of the statute, it would follow that Defendant would have breached a statutory duty and committed a tort."); see also American Bus. Interiors v. Haworth, Inc., 798 F.2d 1135, 1145 (8th Cir. 1986). Accordingly, Defendant's wrongful conduct has been established as a matter of law.[16] Undisputed facts in the record confirm that

[16] See Inter-Tel, Inc. v. CA Communications, Inc., No. Civ. 02-1864 (PAM/RLE), 2003 WL 23119384, *7 (D.

AdvancePCS intentionally interfered with Plaintiffs' business relationship by wrongfully diverting claims from the AARP Program without the knowledge or consent of Plaintiffs or AARP Program participants.

a. **False Representations and Material Omissions**

AdvancePCS knew that the carrier number H020, its BIN, and other patient information were stored by tens of thousands of pharmacies nationwide in the Patient Profiles of millions of AARP members, and that, unless the patient or pharmacist initiated a change to the Patient Profile, claims submitted under the H020 carrier number would be sent automatically to AdvancePCS for processing. See Kenney Tr. at 88-89 and 365 (Puls Aff. Ex. 11). Defendant knew that its conduct would result in many AARP Program participants' claims being diverted to the AdvancePCS Plan even though the participants intended to use the AARP Program:

> Q. And then you knew that on the next day, September 1, 2001, claims being sent to you using those same patient profiles would be processed under the AdvancePCS Prescription Plan and not under the AARP program, right?
> A. We knew that that could happen.
> Q. You knew that pharmacists might inadvertently send to you claims intended for the AARP program and that you would send them over and process them through your AdvancePCS Prescription Plan, right?
> A. We didn't know what the pharmacies would do.
> Q. You knew there was a risk that that could happen, though, right?
> A. It was a possibility.

Bessant Tr. at 217-18 (Puls Aff. Ex.12); see also Kenney Tr. at 87-89, 168-69 (Puls Aff. Ex.11); Guinn Tr. at 143-44 (Puls Aff. Ex.3).

Not only was the continued processing a "possibility" – it was intentional. As Mr. Kenney candidly explained:

> Oh, it was one of our strategies from the very beginning to use the H020 carrier number, because we know that pharmacists are extremely busy, and this re-profiling effort is just one more task they don't want to do. And that was part of

---

Minn. Dec. 29, 2003) (Prange Aff. Ex. E) (holding that evidence of a violation of the MDTPA could also establish tortious interference).

> the reason we had used the H020 designation was that there was three and a half million potential members that they didn't have to re-profile on.

Kenney Tr. at 365 (Puls Aff. Ex.11). After the transition, the intention was made clear when an AdvancePCS employee inquiring into why "stops" were not put in place to prevent continued processing of AARP Program claims under the AdvancePCS Plan was told by Mr. Kenney:

> DO NOT issue any stops on this business. We are currently using this client's old carrier number for our new AdvancePCS Prescription Plan, an internal consumer card offering distributed mainly through pharmacies.

See Puls Aff. Ex. 22 at APCS 01814.

Established pharmacists' expectations required that, upon termination as the PBM for the AARP Program, AdvancePCS stop processing claims carrying the unique carrier number assigned to the AARP Program. See supra Part II(A). AdvancePCS fully appreciated this pharmacist expectation:

> Q. Did anyone at AdvancePCS ever tell you that the industry standard was to reject claims submitted to a program for which AdvancePCS is no longer the PBM?
> A. I can't recall anybody telling me that. I must have gleaned information similar to that someplace, but in general –
> Q. And when you say you gleaned information similar to that, what did you mean?
> A. I guess what I mean is if we're going to terminate a program, if you do want me to stop processing claims, then I will cancel that group or that carrier or that group, whatever it is, you want to cancel.

Kenney Tr. at 78-79 (Puls Aff. Ex.11).[17]

According to documents produced by Defendant, AdvancePCS was aware – and was in

[17] Defendant's decision to reuse H020 for the AdvancePCS Plan ran counter not only to longstanding pharmacists' expectations, but also to AdvancePCS's own internal procedures. Jeannie Church, an employee of AdvancePCS who was responsible for implementing new business, including the new AdvancePCS Plan, testified that carrier numbers for former clients were not reused for new programs, so as not to "interrupt other business." Deposition of Jeannie Church ("Church Tr.") at 42 (Puls Aff. Ex. 24); see also Church Tr. at 51 ("When you normally have new blocks of business, you pick a new carrier number. That's the standard procedure for implementing new business."). Indeed, until AdvancePCS chose to reuse the H020 carrier number previously assigned to the AARP Program, AdvancePCS had never before reused a carrier number. See Kenney Tr. At 91 ("I can't say that I recall prior to [the decision to reuse H020] reusing a carrier number.") (Puls Aff. Ex.11) ; see also Guinn Tr. at 141(Puls Aff. Ex. 3).

fact advised internally – that it was expected that a terminated PBM would "shut down all systems and services on the termination date" and "discontinue claims processing for a client." See Puls Aff. Ex. 23 at APCS 01766. This termination process would include shutting down the carrier number or numbers assigned to that client. See Church Tr. at 108. This expectation was communicated to and understood throughout all management levels at AdvancePCS. See Kenney Tr. at 180-81 (Puls Aff. Ex.11). Nevertheless, Defendant consciously disregarded this expectation.

AdvancePCS clearly knew prior to September 1, 2001 that it would continue to process claims intended for the AARP Program. Yet on multiple occasions, AdvancePCS affirmatively misrepresented just the opposite to Plaintiffs.[18] For example, on or about August 21, 2001, Mr. Kenney knew that the H020 carrier number was going to be reused in order to allow Defendant to continue processing claims intended for the AARP Program. Nevertheless, Mr. Kenney falsely informed Ned Rhodes of ESI that AdvancePCS would "shut down MC/HCO/TROA [acronyms for components of the AARP Program] processing at midnight 8/31/01." E-mail from Ned Rhodes to Marjorie Simos (Aug. 21, 2001) (Puls Aff. Ex. 25 at ESI-1143); see also Deposition of Marjorie Simos ("Simos Tr.") at 85 ("Pat Kenney provided me an e-mail that stated that they [AdvancePCS] would not process claims for the AARP Program.") (Puls Aff. Ex. 14). Mr. Kenney continued this affirmative misrepresentation in an August 24, 2001 e-mail stating: "[a]s of end-of-day 8/31/01 we [AdvancePCS] will not process any claims for RPS." E-

[18] Many of Defendant's affirmative misrepresentations and fraudulent omissions occurred as part of communications between Patrick Kenney of AdvancePCS and Marjorie Simos of ESI during August 2001 – a month before the transition and a period in which AdvancePCS, still the PBM for the AARP Program, had decided internally to continue processing claims submitted under the H020 carrier number. Within AdvancePCS, Mr. Kenney was charged with completing the transition to ESI. In that capacity, Mr. Kenney understood Ms. Simos and ESI to be the primary contact with and conduit of information to the Plaintiffs. See Kenney Tr. at 163 ("I would think most of my communications came through Marge Simos.") (Puls Aff. Ex. 11); see also Bessant Tr. at 175 (understanding that ESI had appointed Marge Simos as Mr. Kenney's contact for the transition of the AARP Program) (Puls Aff. Ex. 12); Sanders Tr. at 141 (Puls Aff. Ex. 8).

mail from Patrick Kenney to Barbara Langcor, carbon copy to Ned Rhodes of ESI (Aug. 24, 2001) (Puls Aff. Ex. 26 at APCS 010215).

AdvancePCS knew these communications were either misleading as to its future intent and/or outright false as to its current actions. The result was a deliberate and conscious effort to deceive Plaintiffs in order to avoid exposure of their scheme. This is evident from Mr. Kenney's admission that he knew Marge Simos believed that Defendant would be rejecting claims:

> Q. Was she asking what reject message AdvancePCS would be sending?
> A. Yes.
> Q. Did her question assume that AdvancePCS would be rejecting claims?
> A. I believe that's a fair assumption.

Kenney Tr. at 229 (Puls Aff. Ex.11). At the direction of his superiors at AdvancePCS, Mr. Kenney deliberately did not correct her assumption, which he knew to be incorrect.

> Q. And the reason you decided not to answer was because if you did, you would have had to tell ESI that you were not going to be rejecting claims with the H020 carrier number, right?
> MS. HACKETT: Objection; calls for speculation.
> THE WITNESS: That's a possible answer.

Bessant Tr. at 250 (Puls Aff. Ex.12).

Moreover, when Mr. Kenney told Ms. Simos and Mr. Rhodes that AdvancePCS "would not process claims for the AARP Program," he neglected to explain AdvancePCS's unique and unprecedented view that not processing a claim for the AARP Program did not mean AdvancePCS would reject the claim. Kenney Tr. at 78-79 ("If we reused the carrier number, we are no longer quote, unquote, rejecting claims under that carrier number, but we have stopped processing claims for the former client.") (Puls Aff. Ex.11). Nor did Mr. Kenney ever reveal that not processing claims for the AARP Program meant Defendant would process those same claims for the AdvancePCS Plan. As a result, Ms. Simos concluded from Mr. Kenney's statements that AdvancePCS would be rejecting claims submitted under the H020 carrier number:

Q. When Mr. Kenney told you that AdvancePCS would no longer be processing the claims, did you interpret that to mean that AdvancePCS would reject claims that was submitted to under the H020 carrier number?
MS. HACKETT: Objection. Leading.
THE WITNESS: Absolutely. Because if they weren't processing, if they had to reject it because the pharmacist had to know what to do with the claim then. If it was processed, the pharmacist would -- it would adjudicate.

Simos Tr. at 240-41 (Puls Aff. Ex.14).

Mr. Kenney knew at the time that his superiors had made the decision that AdvancePCS would not be rejecting such claims. In fact, Mr. Kenney intentionally withheld from Ms. Simos AdvancePCS's decision not to reject H020 claims because he knew that she would thereby learn of AdvancePCS's scheme:

Q. Did you tell her that AdvancePCS would be reusing the H020 carrier number?
A. I definitely didn't tell her that.
Q. And why not?
A. I felt that basically responding to her that in most cases there wouldn't be – a reject message would be giving away proprietary information to our new program, so I did not feel obligated to share it with her.
Q. And just so that I'm clear, what information would have been proprietary?
A. Well, if I were to say we're not going to reject it, that would beg for an explanation, "What do you mean you're not going to reject it? Why are you not rejecting it?" And I would have to explain to her what exactly we were doing to launch our program or lie to her, and I wasn't going to lie to her.

Kenney Tr. at 229-30 (Puls Aff. Ex. 11).[19]

[19] Consumers were not made aware of, nor given an opportunity to consent to, having their claims processed under the AdvancePCS Plan instead of the AARP Program:
Q. And did -- you know, after the -- after September 1st, if a claim was submitted under H020, after the claim was submitted, did AdvancePCS tell the customer that its claim was being processed under the AdvancePCS plan?
A. On September 1st, no, I do not believe so.
Q. Any time after September 1st did AdvancePCS tell the customer?
A. Oh, tell the customer as in patient?
Q. Yes, as in patient.
A. No, we did not directly tell them.
Q. Okay. So isn't it true that the customer has no idea that Advance -- after September 1st that AdvancePCS is processing its claim under the AdvancePCS program?
MS. HACKETT: Objection; lack of foundation, calls for speculation.
THE WITNESS: I don't know how they would know if the pharmacist did not tell them.

b. **Refusal to Stop Wrongful Conduct**

As discussed above, Wal-Mart and CVS alerted AdvancePCS to the confusion and problems associated with AdvancePCS's reuse of the H020 carrier number and demanded that AdvancePCS stop processing claims submitted using that number and/or send proper messaging. Dufour Tr. at 63, 70-74 (Puls Aff. Ex. 9); Mitchell Tr. at 137-38 (Puls Aff. Ex.18). Nonetheless, after being made aware of the confusion it was directly causing, and the fact that patients and pharmacists were unaware that claims intended for the AARP Program were being diverted, AdvancePCS refused to do anything:

> Q. So Mr. Moore told you that Wal-Mart's pharmacists did not know that they were sending AARP program participants to AdvancePCS; is that correct?
> MR. SOLLER: Objection; mischaracterization.
> THE WITNESS: I don't remember what Greg's exact words are, but he said that he couldn't ensure that all Wal-Mart pharmacists knew about our program and the differences between our program and the AARP program.
> BY MS. HSU:
> Q. And did he tell you that AARP program participants that came to Wal-Mart would not know that their claims were being processed by AdvancePCS?
> A. I don't know if he said that exactly.
> Q. But something like that?
> A. Something like that.
> Q. Okay. And after you had these communications with Greg Moore, what did you do?
> A. As I explained, I told him that I wasn't able to shut off the carrier group, and I believe he elevated the position, the issue to Bob Dufour.

Correia Tr. at 274-75 (Puls Aff. Ex. 4); see also Guinn Tr. at 237 (indicating that AdvancePCS informed Wal-Mart that it would not shut off the H020 carrier number) (Puls Aff. Ex.3). Other pharmacies also contacted AdvancePCS in an effort to stop the diversion of AARP Program participants' claims to the AdvancePCS Plan. See e.g., Correia Tr. at 286-90 (Puls Aff. Ex. 4)

---

Kenney Tr. at 107-108 (Puls Aff. Ex.11). Similarly, Defendant did not advertise the AdvancePCS Plan to the public prior to the September 1, 2001 transition. See Correia Tr. at 220 (Puls Aff. Ex.4).

(notification of blocking by Rite-Aid); Correia Tr. at 180 (Puls Aff. Ex. 4) and Ex. 8 APCS 010280 ((Puls Aff. Ex. 16) ("requesting that . . . a block be implemented to prevent AARP's member's prescriptions from being adjudicated, with a message returned to the pharmacy indicating that the member has other insurance or is no longer eligible in a PCS-administered plan."). These requests were ignored. See Correia Tr. at 280-81 (Puls Aff. Ex. 4).

**2. Defendant Interfered With The Business Relationship Between Plaintiffs And The AARP Program Participants**

United entered into an exclusive relationship with AARP for the privilege of serving an identifiable pool of AARP members who were enrolled in the AARP Program. See Deposition of Sheila McMillan ("McMillan Tr.") at 28-30 (Puls Aff. Ex.27). It cannot be disputed that AdvancePCS's diversion of claims submitted by those members for processing through the AARP Program deprived the AARP Program (and therefore, United) of revenue. This diversion impacted United where the uncontroverted evidence shows that United receives a fee for each claim processed through the AARP Program at a price other than "Usual & Customary." See McMillan Tr. at 22-23 (Puls Aff. Ex.27); see also Mead Tr. at 25 (Puls Aff. Ex.6). Because any and all fees paid by, or on behalf of, the approximately 3.5 million AARP Program participants to access the AARP Program are paid directly to United, Mead Tr. at 51-52 (Puls Aff. Ex.6), it is clear that United had a prospective business relationship with the AARP Program participants.

AARP likewise had ongoing and prospective business relationships with the United and the AARP members participating in the AARP Program. Participating AARP members expected to receive the prescription drug discounts and DUR services provided under the AARP Program. AARP expected to receive royalties and other economic benefits from United based on the success of the AARP Program under United's management. AdvancePCS's tortious conduct interfered with these expectations, causing damage to AARP. Not only had AARP contracted

with the AARP Program participants to provide discount and DUR services, but AARP received expected royalties and other economic benefits that were interfered with by Defendant's conduct. See Deposition of Stephen Zaleznick at 177 (Puls Aff. Ex. 28); see also Deposition of Roberta Milman at 86 (Puls Aff. Ex. 29). Also, as this Court and the Court of Appeals both noted, Defendant's conduct also caused AARP potential loss of reputation and goodwill among its members. United HealthCare Ins. Co., 316 F.3d at 742.

Defendant was undoubtedly aware of AARP's relationship with the AARP Program participants and understood that United would receive revenue from the processing of claims through the AARP Program. Affidavit of Kirby Bessant at ¶ 6 (Puls Aff. Ex. 30) (complaining about the revenue United was to receive in its role managing the AARP Program); see also Kenney Tr. at 116 (Puls Aff. Ex.11); Sanders Tr. at 90-91 (Puls Aff. Ex.8). Thus, as a direct and proximate result of Defendant's tortious conduct, Plaintiffs were deprived of significant business opportunities to continue providing services to AARP Program participants.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) dismiss AdvancePCS's remaining counterclaims in their entirety, and (2) grant their motion for partial summary judgment on their claims.

Respectfully submitted,

/s/ Bret A. Puls
David B. Potter (MN #121642)
Bret A. Puls (MN #305157)
OPPENHEIMER WOLFF & DONNELLY LLP
Plaza VII, Suite 3300
45 South Seventh Street
Minneapolis, MN 55402
(612) 607-7000
(612) 607-7100 (fax)

Michael J. Lyle
Holly E. Loiseau
Christine P. Hsu
Eric C. Lyttle
WEIL, GOTSHAL & MANGES LLP
1501 K Street NW, Suite 100
Washington, DC 20005
(202) 682-7000
(202) 857-0940 (fax)
*Attorneys for Plaintiff United HealthCare Ins. Co.*

/s/ Mark J. Briol
Mark J. Briol (MN #126731)
Vicki J. Bitner (MN #213998)
Amy J. Ihlan (MN #162905)
BRIOL & ASSOCIATES, PLLC
3700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 337-8410
(612) 337-5151 (fax)
*Attorneys for Plaintiff AARP*

Dated: July 6, 2004