# EXHIBIT D

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

HOLLYWOOD HEALTHCARE CORP., d/b/a
LogiMedix, Plaintiff,
v.
DELTEC, INC., Defendant.

**No. Civ.04-1713(RHK/AJB).**

May 17, 2004.

Ronald K. Gardner and Scott Korzenowski, Dady & Garner, PA, Minneapolis, Minnesota, and Robert Zarco and Robert M. Einhorn, Zarco, Einhorn, & Salkowski, PA, Miami, Florida, for Plaintiff.

Jonathan S. Parritz and R. Christopher Sur, Maslon, Edelman, Borman & Brand, Minneapolis, Minnesota, for Defendant.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction

*1 Prior to the present dispute, Plaintiff Hollywood Healthcare Corp ., d/b/a LogiMedix ("LGM") distributed Defendant Deltec, Inc.'s ("Deltec") products. After LGM failed to make good on its debts to Deltec, Deltec informed customers that it would no longer be able to offer its products through LGM. LGM has sued Deltec--and Deltec has counterclaimed--for, among other things, breach of contract. Before the Court are cross-motions for a preliminary injunction. [FN1] For the reasons set forth below, the Court will deny both motions. [FN2]

FN1. Deltec has also filed a Motion for Expedited Discovery.

FN2. The following constitutes the Court's findings of fact and conclusions of law, as required by Rules 52(a) and 65 of the Federal Rules of Civil Procedure. It does not, however, constitute a final resolution on the merits. *See* Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court [on a motion for a] preliminary injunction are not binding at trial on the merits.").

Background

*I. The Distribution Agreement*

Deltec, a Minnesota corporation with its principal place of business in St. Paul, Minnesota, manufactures and distributes medical products, including its Cozmo insulin pump. (Kellogg Aff. ¶ 3; Compl. ¶ 2.) On November 18, 2002, Deltec and LGM, a Florida corporation with its principal place of business in Weston, Florida, entered into a "Non-Exclusive Distribution Agreement," in which LGM would distribute Deltec's Cozmo insulin pump in the United States and Puerto Rico. (Kellogg Aff. ¶ ¶ 7-8, Ex. A (Distribution Agreement); Kusher Decl. ¶ 5; Compl. ¶ 1.)

In the Distribution Agreement, Deltec appointed LGM to be a "non-exclusive distributor" but "reserve[d] the right to sell the Products directly to Customers." (Distribution Agreement § 2.1.) "Customer" is defined as the "end-user patient to which [LGM] sells the Products" (*id.* § 1.1.1) and "Products" is defined as, among other things, Cozmo insulin pumps (*id.* § 1.1.6, Schedule 1). Not only did Deltec reserve the right to sell directly to customers, the Distribution Agreement provided that "[n]othing in this Agreement shall prevent [Deltec] from selling or supplying Products to third parties in or outside" the United States and Puerto Rico. (*Id.* § 8.2.)

The Distribution Agreement also provided that LGM would pay all invoices submitted by Deltec within 30 days, but if it failed to do so, Deltec was authorized to "withhold shipments of the Products." (*Id.* § 7.4.) Additionally, regardless of payment or non-payment, Deltec could, with notice to LGM, "reject or cancel any order for any or no reason." (*Id.* § 8.1.) Also, both Deltec and LGM agreed to comply with the Health Insurance Portability and Accountability Act ("HIPPA"), as specifically set out in the Distribution Agreement. (*Id.* § 10, Schedule 6.)

As for duration, Deltec could terminate the

Distribution Agreement at any time, by providing written notice to LGM in the event LGM was in breach of the Distribution Agreement and had not cured its breach within 30 days of receiving notice. (*Id.* § § 12.2, 12.2.1.)

*II. The KFLP Guaranty*

On the same day the Distribution Agreement was entered into, November 18, 2002, LGM's President, Robert Kusher, on behalf of the Kusher Family Limited Partnership ("KFLP"), executed a "Guaranty of Payment." (Kellogg Aff. ¶ 19-21, Ex. B (Guaranty).) Under the Guaranty, KFLP guaranteed the payment of all debts and obligations owed to Deltec by LGM. (*Id.* Ex. B (Guaranty).)

*III. LGM Falls Behind on its Payments to Deltec*

***2** Between December 13, 2002 and October 1, 2003, Deltec supplied LGM with over $3.4 million worth of insulin pumps and related products and services. (Kellogg Aff. ¶ 22.) Throughout 2003, LGM distributed over one thousand insulin pumps. (Kusher Decl. ¶ 11.) But by October 1, 2003, LGM owed Deltec over $1.6 million for products and services, of which $1.1 million was over 30 days past due. (Kellogg Aff. ¶ 24, Ex. C.) In early October 2003, Kusher sought financing to pay down LGM's debt (Kellogg Aff. ¶ 25; *see* Kusher Decl. ¶ 14.) In the meantime, Deltec extended credit to LGM for 90 days beginning October 21, 2003, conditioned upon obtaining a security agreement from LGM. (Kellogg Aff. ¶ 26.)

*IV. The Security Agreement*

On November 5, 2003, Deltec and LGM executed a "Security Agreement" in which LGM granted Deltec a security interest in LGM's "Collateral," which was defined as "[a]ll product inventory" and "Accounts Receivable which are lawfully subject to pledge." (Kellogg Aff. ¶ ¶ 27-28, Ex. D (Security Agreement § 1, Ex. A).) Under the Security Agreement, LGM agreed to furnish Deltec with "statements and schedules further identifying and describing the Collateral." (Security Agreement § 7.) In addition, the Security Agreement was conditioned upon LGM obtaining financing and LGM would be deemed in default if it "[f]ail [ed] ... to secure financing within ninety (90) days of the date hereof to provide sufficient payments to [Deltec] to bring the amount owing by [LGM] to [Deltec] within the payment terms set forth in the Distribution Agreement (specifically within 30 days of invoice date)." (*Id.* § 11(a).)

In the event of LGM's default under the Security Agreement, Deltec had the "right, at its option and without demand or notice, to exercise all the rights and remedies of a Secured Party under the Uniform Commercial Code." (*Id.* § 11.) Deltec subsequently filed a "UCC Financing Statement" with the Florida Secretary of State regarding its security interest in LGM's product inventory and accounts payable. (Kellogg Aff. ¶ 36, Ex. E.)

*V. Hard Times for LGM and Kusher*

On November 7, 2003, Kusher notified Deltec that he was laying off his entire sales force. [FN3] (Kellogg Aff. ¶ 39; *see* Kusher Decl. ¶ 13.) Two months later, on January 8, 2004, Kusher was indicted in Florida for Medicare fraud. (Kellogg Aff. ¶ 41, Ex. G.) On January 9, 2004, Deltec received a "Severe Risk Option" report from Dun & Bradstreet, a commercial provider of business information, identifying LGM as a "Higher Risk" and highlighting Kusher's arrest and indictment. (*Id.* ¶ 42, Ex. H.)

FN3. The parties dispute what caused the lay-offs. Kusher contends that he had to make the lay-offs because of Deltec's difficulties in supplying products. Without products, Kusher asserts that LGM was unable to support its sales force or meet customer demand. (Kusher Decl. ¶ ¶ 12-13.) Deltec responds that LGM's lay-offs are not the result of supply shortages. (Kellogg Aff. ¶ 64.) It contends that in early 2003 it voluntarily recalled 173 insulin pumps sold to LGM and that in late 2003 there were delays in its delivery of pumps to LGM as a result of a lag in receiving a specific part from a European parts supplier. (*Id.* ¶ ¶ 65-66). By the first week of December 2003, however, Deltec asserts that it filled all of LGM's outstanding orders. (*Id.* ¶ 66.)

*VI. Deltec and LGM Try to Continue Working Together*

By February 28, 2004, more than 90 days after signing the Security Agreement, LGM still owed Deltec over $2.25 million, of which $2.2 million was past 30 days due. (Kellogg Aff. ¶ 43, Ex. I .) On March 18, 2004, Deltec proposed that it would continue shipping its products to LGM, but only on the condition that LGM would pay Deltec three times the value of any new order until LGM's debt was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

repaid. (*Id.* ¶ 44.) On March 24, 2004, Kusher told Deltec that he was not able to pay three times the value of any new orders, but proposed that he would pay for products "C.O.D." plus an additional $10,000. (*Id.* ¶ 46, Ex. J; Kusher Decl. ¶ 16.) Neither side accepted the other's proposal. In addition, Kusher informed Deltec that he was unable to secure the financing needed to repay LGM's debts to Deltec. (Kusher Decl. ¶ 14; Kellogg Aff. ¶ 45, Ex. J.)

*VII. Deltec Sends LGM a Default Notice*

***3** As of March 25, 2004, the amount LGM owed Deltec that was over 30 days past due totaled $2,319,799. (Kellogg Aff. ¶ 49.) On that date, Deltec sent LGM and KFLP a letter notifying them that LGM was in default of its obligations under the Security Agreement, the Distribution Agreement, and the Guaranty. (*Id.* ¶ 50, Ex. K.) First, Deltec informed LGM that it was in default of § 11(a) of the Security Agreement by failing to secure financing. (*Id.* ¶ 51, Ex. K.) Deltec noted that under § 11 of the Security Agreement, "in the event of a Default, [it] has the right ... to exercise all of the rights and remedies of a secured party under the Uniform Commercial Code," including the right to notify "[LGM's] account debtors to make payment directly to Deltec, and foreclosure of [LGM's] product inventory." (*Id.* Ex. K.)

Second, Deltec informed LGM that it was in default of the Distribution Agreement by failing to pay invoices within 30 days of the invoice date. (*Id.* ¶ 51, Ex. K.) Deltec specifically referred to § 12.2 of the Distribution Agreement, which provides that Deltec may terminate the agreement if LGM is in breach and has not cured its breach within 30 days, and noted that "[t]his letter is the notice required under Section 12.2." (*Id.* Ex. K.) Deltec also informed LGM that it "intends to make its products available directly to customers." (*Id.*)

Finally, Deltec advised that it had learned that LGM was telling customers that the Deltec pumps were "not available" and instructed LGM to cease "from [making] such false and disparaging statements." (*Id.*)

*VIII. Deltec Sends a Letter to Patients and LGM Business Partners*

On March 29, 2004, Deltec mailed a letter notifying all customers that Deltec was no longer able to offer its products through LGM. (Kellogg Aff. ¶ 62, Ex. L; Kusher Decl. ¶ 18.) The letter stated:

Dear Deltec Cozmo® Insulin Pump User,

> Our records indicate that you purchased your Deltec Cozmo® insulin pump through LogiMedix, a Smiths Medical--Deltec distributor located in Weston, Florida. Unfortunately, due to business reasons, we are no longer able to offer Smiths Medical--Deltec products, including infusion sets and cartridges, through LogiMedix effective March 29, 2004.
>
> You can still get infusion sets and cartridges directly from Smiths Medical or another distributor of your choice. Please contact Deltec Customer Service at 1-800-826-9703 for assistance in your next re-order of cartridges and infusion sets for your Deltec Cozmo® insulin pump. Plan on allowing a little extra time for your next re-order to be processed as your insurance information will need to be transferred directly to us or the distributor of your choice.
>
> We apologize for this inconvenience and will make every attempt to conduct this transition in a timely and worry free manner so that you can continue to enjoy the benefits of your Deltec Cozmo Insulin Pump without interruption. Do not hesitate to contact Deltec Customer Service at 1-800-826-9703 if you have any questions.
>
> ***4** Thank you for placing your trust in the Deltec Cozmo Insulin Pump and Smiths Medical.

(Kellogg Aff. Ex. L.) After Deltec's letter was mailed, LGM received calls from patients and others inquiring about LGM's business relationship with Deltec, and one patient told LGM that she opted to deal with another distributor as advised in the letter. (Kusher Decl. ¶ 19.)

*IX. Procedural History*

On April 22, 2004, LGM filed its Complaint alleging six causes of action and requesting preliminary and permanent injunctive relief. (Compl.¶ ¶ 26-73.) The six causes of action are (1) breach of contract, (2) tortious interference with business relationship, (3) violation of the Minnesota Uniform Deceptive Trade Practices Act, (4) deceptive acts against senior citizens, (5) violation of the Minnesota Uniform Trade Secrets Act, and (6) business defamation. (*Id.*)

On May 5, 2004, Deltec responded by filing an Answer, Counterclaim, and Third Party Complaint against LGM, KFLP, and Kusher. Deltec alleges (1) breach of the Distribution Agreement, (2) breach of the Security Agreement, (3) Guaranty liability, (4) intentional misrepresentation, (5) negligent misrepresentation, (6) violation of the Minnesota Uniform Deceptive Trade Practices Act, and (7) business defamation. It also requests a declaratory

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

judgment "that its use of customer information to communicate with customers concerning continued availability of Deltec products, and to receive payment for purchases of such products, is fully consistent with all applicable agreements between Deltec and LogiMedix, and applicable law." (Compl.¶¶ 68-93.)

Standard of Review

Whether preliminary injunctive relief should be granted depends on an evaluation of the following factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981); *see* Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir.2003). A preliminary injunction is an extraordinary remedy, and the party seeking injunctive relief bears the burden of proving all the *Dataphase* factors. Watkins, 346 F.3d at 844.

Analysis

Both sides have moved for temporary restraining orders or preliminary injunctions. The Court will begin with LGM's motion.

*I. LGM's Motion*

LGM requests an order "preliminarily enjoining DELTEC from continuing to contact LGM's patients, customers, sub-distributors, and business partners." (LGM's Mem. in Supp. at 3.) The Court will start its *Dataphase* analysis by assessing LGM's likelihood of success on its claims.

A. Likelihood of Success

1. Breach of Contract

LGM alleges that Deltec breached two provisions of the Distribution Agreement. (LGM's Mem. in Supp. at 7-8.) First, it asserts that by "effectively terminating" the Distribution Agreement with its March 29, 2004 letter to customers, Deltec breached § 12.2.1 by failing to provide LGM 30 days to cure the defaults it was given notice of four days earlier in the March 25, 2004 default letter. (*Id.* at 8.) LGM responds that LGM has not shown a likelihood of success on this claim because the March 29 letter "was not a premature termination of the Distribution Agreement" (Deltec's Mem. in Opp'n at 19) and that it "was specifically permitted by the Distribution Agreement, the Security Agreement, and the U.C.C. to contact the customers" (*id.* at 15).

*5 LGM has not shown a likelihood of success on its claim for breach of § 12.2.1. It is unlikely that LGM can succeed on its major premise--i.e., that Deltec's March 29 letter "effectively terminat[ed]" the Distribution Agreement. Deltec's letter states, in pertinent part, "Unfortunately, due to business reasons, we are no longer able to offer Smith Medical--Deltec products, including infusion sets and cartridges, through LogiMedix effective March 29, 2004." (Kellogg Aff. Ex. L.) This language does not state that the Distribution Agreement was or will be terminated, but simply that Deltec will not be offering its products though LGM. When the letter was written, not offering products through LGM was an option Deltec had available to it under the existing Distribution Agreement. At that time, the amount LGM owed Deltec that was over 30 days past due totaled $2,319,799. (Kellogg Aff. ¶ 49.) Section 7.4 of the Distribution Agreement provides that Deltec "may withhold shipments of the Products if [LGM] has not paid an invoice when due." (Distribution Agreement § 7.4.) The Distribution Agreement also provides that, irrespective of payment, Deltec, with notification, "may reject or cancel any order for any or no reason." (*Id.* § 8.1.) Thus, rather than "effectively terminating" the Distribution Agreement as LGM argues, Deltec's letter reflected the utilization of unterminated contractual provisions. As Deltec puts it, "The statement that LogiMedix would no longer be supplying Deltec supplies was simply the truth-- [Deltec] had no obligation under the Distribution Agreement to continue to ship product to LogiMedix and it was not going to do so." (Deltec's Mem. in Opp'n at 19.)

Second, LGM asserts that Deltec's March 29 letter also breached § 10 of the Distribution Agreement. (LGM's Mem. in Supp. at 9.) Under § 10, both parties agreed to comply with HIPPA as set out in Schedule 6. (Distribution Agreement § 10.) Schedule 6 provides that Deltec "may receive ... Customer Confidential Information which constitutes 'Protected Health Information' ("PHI"), as defined under the HIPPA" and that, except as otherwise provided, Deltec "may make any and all uses and disclosures of PHI received from, or created or received on behalf of, [LGM] necessary to perform its obligations under the Agreement." (*Id.* Schedule 6, § 1.) Schedule 6 also provides that "[w]ith regard to the use and/or disclosure of PHI, [Deltec] agree[d] to ... use appropriate safeguards to prevent use or disclosure of PHI other than as permitted or required by this Agreement." (*Id.* Schedule 6, § 1.2.)

LGM has not demonstrated a likelihood of success on its claim for breach of § 10. LGM contends that "DELTEC's use of 'PHI' to market and sell its products directly to LGM's patients was not 'necessary to perform its obligations" ' and breached the Distribution Agreement. (LGM's Mem. in Supp. at 9.) Other than conclusory allegations, however, LGM fails to show how Deltec's letter was "not 'necessary to perform its obligations under the Agreement." ' For example, LGM does not explain what "necessary to perform its obligations" means under the Distribution Agreement; it does not elaborate on what "PHI" Deltec supposedly misused; it does not expand on how such use of "PHI" was improper, and it does not cite a single statute, regulation, or case to support its claims that Deltec has violated HIPPA. [FN4] It is LGM's burden to show a likelihood of success and it has failed to meet that burden. Perhaps LGM will be able to muster a better argument in the later stages of this litigation, but its current showing falls short. [FN5]

FN4. Although Deltec responds that "[n]othing in HIPPA prohibits [the March 29] customer communication," and actually provides an argument complete with citations to regulations and case law (Deltec's Mem. in Opp'n at 15-19), the Court need not assess its arguments here because of LGM's insufficient showing.

FN5. At oral argument, LGM's counsel made a passing reference to § 9 of the Distribution Agreement, which defines "Confidential Information," and intimated that Deltec's March 29 letter breached that provision. Although § 9 broadly provides that "Confidential Information shall mean all information supplied by one Party to the other," there is

no obligation of confidentiality or non-use ... to information which: ... is in the public domain at the time of disclosure; ... is supplied to the Recipient by a third party having a legal right to do so; can be proved to the reasonable satisfaction of the other Party to have been developed independently by the Recipient without resort to the disclosure; or ... which the Recipient is obligated to disclose by law....

(Distribution Agreement § § 9.3, 9.3.1-9.3.5.) Even if LGM had alleged in its Complaint that Deltec breached § 9, which is not apparent from either the face of LGM's Complaint or from its memoranda on this motion, its passing reference to this provision is clearly insufficient to show a likelihood of success on the merits.

2. Tortious Interference with Business Relationship

*6 LGM next alleges that Deltec's March 29 letter tortiously interfered with its business relationships with its patients and business partners. (LGM's Mem. in Supp. at 9-11.) Under Minnesota law,

> [t]o establish a claim for tortious interference with prospective business relations, "a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship." *Hunt v. University of Minn.*, 465 N.W.2d 88, 95 (Minn.Ct.App.1991) (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn.1982)). Justification or privilege is a defense to a claim of tortious interference. *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 506 (Minn.1991).

*Glass Service Co., Inc. v. State Farm Mut. Auto. Ins. Co.*, 530 N.W.2d 867, 871 (Minn.Ct.App.1995). "[O]ne intentionally and improperly interferes with another's prospective business relation by (1) inducing a third person not to enter into or to continue the prospective relation, or (2) preventing the other from continuing the prospective relationship." *Hough Transit, Ltd. v. Nat'l Farmers Org.*, 472 N.W.2d 358, 361 (Minn.Ct.App.1991) (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632-33 (Minn.1982)).

"The law clearly requires the actor's conduct to be improper before liability for interference with prospective contractual relations will attach. To determine whether the actor's conduct is improper, several factors must be examined." *R.A., Inc. v. Anheuser-Busch, Inc.*, 556 N.W.2d 567, 571 (Minn.Ct.App.1996) (citing Restatement (Second) of Torts § 766B cmt a). These factors are:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference, and
> (g) the relations between the parties.

*Id.* (citing Restatement (Second) of Torts § 767;

Northside Mercury Sales & Serv. v. Ford Motor Co., 871 F.2d 758, 761 (8th Cir.1989) (applying Minnesota law)).

LGM argues that Deltec intended to induce LGM's patients and business partners not to enter into or continue their prospective relations with LGM "by falsely advising them that LGM was no longer associated with DELTEC and, thus, would not be providing DELTEC products and services." (LGM's Mem. in Supp. at 10.) Deltec responds that it did not commit a wrongful act because it was permitted to send the letter under the Distribution Agreement. (Def.'s Mem. in Opp'n at 19.)

LGM has not shown a likelihood of success on its claim for tortious interference. First, under the Distribution Agreement LGM was a "non-exclusive distributor" and Deltec was permitted to sell its products directly to customers in LGM's territory. (Distribution Agreement § 2.1, *see also id.* § 8.2 ("Nothing in this Agreement shall prevent the Company from selling or supplying Products to third parties in or outside the Territory.") Second, as noted above, the Distribution Agreement permitted Deltec from withholding shipments of its products if LGM did not pay the invoices when due. (*Id.* § 7.4.) Thus, Deltec was entitled to stop offering its products through LGM. Considering the applicable factors, LGM has not established that Deltec's exercise of its contractual rights was improper. *See* R.A., 556 N.W.2d at 571 (finding as a matter of law that defendant was not liable for tortious interference with prospective contractual relations for exercising its contractual rights).

3. Violation of the Minnesota Deceptive Trade Practices Act ("MDTPA")

*7 LGM also alleges that Deltec's March 29 letter violated the MDTPA, Minn.Stat. 325D.44, subd. 1(3), (8). (LGM's Mem. in Supp. at 11-13.) The MDTPA provides that a person engages in a deceptive trade practice when the person, *inter alia:*

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another; ...

(8) disparages the goods, services, or business of another by false or misleading representation of fact ...

Minn.Stat. § 325D.44, subd. 1. To establish liability under the MDTPA, a complainant need not prove competition between the parties or actual confusion or misunderstanding. *Id.* § 325D.44, subd. 2. Proof of a mere likelihood of confusion or misunderstanding is sufficient. *Claybourne v. Imsland,* 414 N.W.2d 449, 451 (Minn.Ct.App.1987).

With respect to subpart (3) of subsection 1, LGM asserts that it is likely to succeed in showing a violation because "DELTEC's actions likely caused confusion or misunderstanding among LGM's patients and business partners with regard to LGM's affiliation with DELTEC." (LGM's Mem. in Supp. at 12.) LGM's concern is that the letter left its patients and partners wondering if LGM was affiliated with Deltec or not. (*See id.*) Contrary to LGM's assertions, however, there is nothing from the face of the letter that demonstrates a likelihood of confusion or misunderstanding as to LGM's affiliation with Deltec. [FN6] Deltec's statement that it was no longer able to offer its products through LGM was a true statement. LGM has cited no cases in which a court has determined that conduct similar to Deltec's violated the MDTPA. [FN7] Accordingly, at this time and on this record, the Court concludes that LGM has not shown a likelihood of success on this claim.

FN6. Although LGM alleges that Deltec's letter "actually caused such confusion," as one patient "abandoned LGM," (LGM's Mem. in Supp. at 12), ¶ 19 of Kusher's Declaration, which LGM cites in support, does not indicate any confusion on the part of the patient.

FN7. While certainly not a comprehensive survey of the law, it appears that subpart (3) typically deals with confusion or misunderstanding about affiliation in the context of deceptively similar trade names. *See, e.g.,* Claybourne, 414 N.W.2d at 451; Mid-List Press v. Nora, 275 F.Supp.2d 997, 1003 (D.Minn.2003) (Doty, J.).

With respect to subpart (8) of subsection 1, LGM asserts that it is likely to succeed because "DELTEC's inappropriate communication clearly disparaged LGM's business since they were based on false and misleading representations." (LGM's Mem. in Supp. at 12.) The letter, according to LGM, "left LGM's patients and business partners with the clear impression that LGM had done something seriously wrong which caused DELTEC to no longer wish to do business with LGM." (*Id.*) Deltec responds that stating that it would no longer be offering its products through LGM was truthful and was authorized under the Distribution Agreement. (Deltec's Mem. in Opp'n at 20.) The burden is on LGM to prove that Deltec's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

statements were false. United Wild Rice, 313 N.W.2d at 635. For the reasons previously discussed, LGM has not met its burden. Accordingly, LGM has not demonstrated that it is likely to succeed on this claim.

4. Deceptive Acts Against Senior Citizens

Section 325F.71 provides for a supplemental civil penalty against persons who engage in conduct prohibited by the MDTPA and whose conduct has been perpetrated against one or more senior citizens--i.e., individuals who are age 62 or over. Minn.Stat. § 325F.71, subds. 1(a) and 2(a). Because LGM has not shown a likelihood of success on its MDTPA claims, LGM has not shown a likelihood of success on this claim.

5. Violation of the Minnesota Uniform Trade Secrets Act

***8** LGM asserts that it will succeed on its claim that Deltec's letter misappropriated LGM's confidential patient information in violation of the Minnesota Trade Secrets Act, Minn.Stat. § 325C. (LGM's Mem. in Supp. at 14-15; LGM's Reply Mem. in Supp. at 8-9.) Minnesota's Trade Secrets Act requires the party seeking protection to show both the existence and the misappropriation of a trade secret. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn.1983). To establish that a particular item is a "trade secret" under the Act, LGM bears the burden of proving that (1) the information is not generally known or readily ascertainable, (2) the information derives independent economic value from secrecy, and (3) they make reasonable efforts to maintain the information's secrecy. [FN8] *See NewLeaf Designs, L.L.C. v. BestBins Corp.*, 168 F.Supp.2d 1039, 1043 (D.Minn.2001) (Tunheim, J.); *Lexis-Nexis v. Beer*, 41 F.Supp.2d 950, 958 (D.Minn.1999) (Doty, J.).

FN8. The Act defines a "trade secret" as information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
Minn.Stat. § 325C.01, subd. 5.

LGM has not established a likelihood of success because it has not demonstrated that its customer lists are trade secrets. Beyond mere conclusory allegations (*see* LGM's Reply Mem. in Supp. at 8-9), LGM has not shown that the customer's names are not generally known or readily ascertainable, that the list derives independent economic value from its alleged secrecy, or that it has made reasonable efforts to maintain the lists' secrecy.

6. Business Defamation

Finally, LGM contends that it is likely to succeed in showing that Deltec's March 29 letter defamed it. (LGM's Mem. in Supp. at 15-16.) "In order for a statement to be considered defamatory it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980) (citations omitted). "Slanders affecting the plaintiff in his business, trade, profession, office or calling are slanders per se and thus actionable without any proof of actual damages." *Id.* (citations omitted). "Truth, however, is a complete defense, and true statements, however disparaging, are not actionable." *Id.*

Again, LGM has not shown a likelihood of success because it has not demonstrated that anything in Deltec's March 29 letter was false. At the cost of being repetitious, the letter stated that "due to business reasons, we are no longer able to offer Smiths Medical--Deltec products ... through LogiMedix." (Kellogg Aff. Ex. L.) This is a true statement. The letter does not say, as LGM believes it does, that "LGM can no longer offer any Deltec products ." (LGM's Reply Mem. in Supp. at 9.) While it is also true that LGM possesses 150 boxes of Deltec insulin cartridges available for sale (Kusher Supp. Decl. ¶ 5), this does not make Deltec's statement false. It is completely consistent for Deltec to state that it will *no longer* be able to offer its products through LGM effective March 29, and for LGM to have Deltec products simultaneously sitting on its shelves.

B. The Remaining *Dataphase* Factors

***9** Having concluded that LGM has not met its burden of establishing a likelihood of success on the merits of its claims, the remaining factors--none of which tip the balance of equities towards an injunction--may be dealt with briefly. "The basis of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. Thus to warrant ... preliminary [injunctive relief], the moving party must demonstrate a sufficient threat of irreparable harm." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir.1999) (citation omitted). Because LGM has not met its burden with respect to success on the merits of its claims, the Court cannot infer that LGM would suffer irreparable harm unless Deltec is enjoined from contacting customers. *See* Lexis-Nexis, 41 F.Supp.2d at 959.

Furthermore, LGM has failed to meet its burden to show that the harm it will suffer in the absence of a preliminary injunction outweighs the potential harm that granting a preliminary injunction may cause Deltec. *See* Dataphase, 640 F.2d at 114. The essential inquiry in weighing the equities "is whether the balance of other factors tips *decidedly* toward the movant." General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 624 (8th Cir.1987) (emphasis added). Where the movant has failed, as here, to "demonstrate a probability of ultimate success, the possibility that it will suffer any harm from [the challenged activity] is highly speculative and therefore does not serve to tip the balance of equities." United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1184 (8th Cir.1998). At this stage it would also be contrary to public policy to enjoin Deltec, given that LGM has not carried its burden on the other *Dataphase* factors.

*II. Deltec's Motion*

Deltec has filed a Motion for Temporary Restraining Order or Preliminary Injunction and for Declaratory Relief. It also requests the appointment of a receiver. (Deltec's Mem. in Supp. at 2, 27.) The Court will begin with Deltec's request for a receiver.

A. Appointment of a Receiver

According to its Proposed Order, Deltec requests an order stating that, "A receiver shall be appointed to marshal all assets of LogiMedix so that its debt to Deltec can be fully satisfied." (Proposed Order ¶ B; *see* Deltec's Mem. in Supp. at 2, 27.) "A receiver is a person appointed by the court to be 'an officer of the court to receive, collect, care for, administer, and dispose of the property or the fruits of the property of another or others brought under the orders of the court by the institution of a proper action or actions." ' 13 James Wm. Moore et al., *Moore's Federal Practice* § 66.02 (3d ed.2004) (footnote omitted); *see* Booth v. Clark, 58 U.S. 322, 331 (1854) ("A receiver is an indifferent person between parties, appointed by the court to receive the rents, issues, or profits of land, or other thing in question in this court, pending the suit, where it does not seem reasonable to the court that either party should do it."). "The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir1993) (citing Fed.R.Civ.P. 66 and Advisory Committee's Note) (other citations omitted).

***10** "A receiver is an extraordinary equitable remedy that is only justified in extreme situations." *Id.* Although there is no precise formula for determining when to appoint a receiver, factors typically warranting appointment are (1) a valid claim by the party seeking the appointment, (2) the probability that fraudulent conduct has occurred or will occur to frustrate that claim, (3) imminent danger that property will be concealed, lost, or diminished in value, (4) inadequacy of legal remedies, (5) lack of a less drastic equitable remedy, and (6) likelihood that appointing the receiver will do more good than harm. *Id.* 316-17.

Deltec contends that a receiver should be appointed in this case because "LogiMedix is in desperate financial straits and Kusher has been indicted on serious criminal charges." (Deltec Mem. in Supp. at 27.) Without a receiver, Deltec continues, it "is in danger of being deprived of any remedy, both with respect to its current possessory interest in collateral under the Security Agreement, and with respect to other assets that could be used to satisfy LogiMedix's multi-million dollar debt to Deltec." (*Id.*) LGM responds that the extraordinary remedy of a receiver should not be allowed because Deltec has not shown any evidence of fraud, imminent danger, or inadequacy of legal remedies. (LGM's Mem. in Opp'n at 3.)

The Court will not appoint a receiver at this time. A receiver is an "extraordinary remedy that is only justified in extreme situations." Aviation Supply Corp., 999 F.2d at 316. Although LGM is deep into debt to Deltec and Kusher has been indicted in an unrelated Medicare fraud case, this is not an "extreme situation." Deltec has not shown a sufficient probability that fraudulent conduct has occurred or will occur to frustrate its claims. Nor has it shown that its property interests are in imminent danger of being concealed, lost, or diminished in value. Furthermore, Deltec has available adequate legal remedies--i.e., exercising its rights as a secured party under the Uniform Commercial Code and seeking damages at trial. Finally, Deltec has not established

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

that appointing a receiver would do more good than harm, given the costs of appointment.

B. Deltec's Motion for a Temporary Restraining Order or Preliminary Injunction

In addition to a receiver, Deltec also requests an order stating that:

• "LogiMedix, Kusher, KFLP" and their agents "are prohibited [from] taking any action to encumber, convey, transfer, or alienate any assets, including but not limited to accounts receivable, inventory, real estate, or any other thing of value owned, in whole or in part, by LogiMedix" (Proposed Order ¶ A);

• "LogiMedix, Kusher and KFLP shall cooperate in a complete accounting of all assets, operations and financial condition of LogiMedix" (Proposed Order ¶ E);

• "All LogiMedix's customer information may lawfully [be] used by Deltec for the purposes of 1) contacting such customers to assure them of the availability of continued supply from Deltec and/or other distributors, and 2) collecting all accounts payable to LogiMedix which comprise Deltec collateral" (Proposed Order ¶ F); and

***11** • "LogiMedix, Kusher, KFLP" and their agents "are prohibited from making, either directly or indirectly, any disparaging or untrue statements about Deltec to any LogiMedix customer" (Proposed Order ¶ G).

The Court will start its *Dataphase* analysis by assessing Deltec's likelihood of success on its claims.

1. Likelihood of Success

Although the Court is satisfied that Deltec has shown a likelihood of success on each of its breach of contract claims, [FN9] it has not shown a likelihood of success on any other claim. First, Deltec has made no effort in its memoranda to show a likelihood of success on its claims for intentional and negligent misrepresentation and its claims under the Minnesota Uniform Deceptive Trade Practices Act. Second, while Deltec at least made an effort to show a likelihood of success on its defamation claim, its effort fails. The only evidence put forth of LGM's alleged defamation comes from the affidavit of Rod Kellogg. (*See* Deltec's Mem. in Supp. at 21.) Kellogg states, "Deltec informed LogiMedix that LogiMedix's representative had been stating to customers that Deltec pumps were 'not available.' ' (Kellogg Aff. ¶ 57.) Deltec has not shown, however, that this statement was false. *See* Stuempges, 297 N.W.2d at 255 (stating that for a statement to be defamatory "it must be false"). It is possible that when this statement was made, if it was made, Deltec's products where actually--if only temporarily--"not available." This is especially possible in the case of the alleged supply shortage. *See supra* n. 3. Therefore, the Court cannot conclude that Deltec has shown likely success on this claim.

FN9. Deltec has shown it is likely to succeed on its claims that (1) LGM is in breach of § 7.4 of the Distribution Agreement by not paying Deltec's invoices within 30 days of the date of the invoice; (2) LGM is in breach of § 11(a) of the Security Agreement by failing to secure financing to pay its debt to Deltec, and (3) that KFLP is in default of the Guaranty.

2. Irreparable Harm

Although Deltec has shown a likelihood of success on its breach of contract claims, it has not shown irreparable harm. "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins,* 346 F.3d at 844 (citations omitted). "When there is an adequate remedy at law, a preliminary injunction is not appropriate." *Id.* (citation omitted). Here, Deltec has an adequate remedy at law. As Deltec recognizes in its memoranda, and as LGM's counsel noted at oral argument, Deltec has rights as a secured party under the Security Agreement and the Uniform Commercial Code to foreclose on its security interests. It has made no attempt, however, to exercise its rights.

Moreover, while "[t]he Eighth Circuit has held that the threat of unrecoverable economic loss due to a company's bankruptcy or insolvency can constitute irreparable harm," *Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.,* Civ. No. 02-213, 2002 WL 649086, at *4 (D.Minn. Apr. 17, 2002) (Tunheim, J.) (citing *Iowa Utilities Board v. Fed. Communications Comm'n,* 109 F.3d 418, 425-26 (8th Cir.1996); *Airlines Reporting Corp. v. Barry,* 825 F.2d 1220, 1227 (8th Cir.1987)), Deltec has made no showing that LGM is bankrupt or insolvent. Despite demonstrating that LGM has not paid its invoices, Kusher has laid-off his sales force, and Kusher has been indicted in an unrelated matter, Deltec has not yet "demonstrated a clear probability that [LGM] will not be able to satisfy an award of adequate damages." *Airlines Reporting Corp.,* 825 F.2d at 1227. If discovery reveals evidence of LGM's insolvency, to give one example, Deltec may return to this Court for an appropriate order. At this time, however, Deltec

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

has not satisfied its burden for the requested preliminary injunctions.

C. Deltec's Motion for Expedited Discovery

***12** Finally, Deltec has filed a Motion for Expedited Discovery in which it requests an order that:

- "LogiMedix, Kusher and KFLP shall produce to Deltec's counsel in Minneapolis by May 17, 200[4] all documents responsive to Deltec['s] First Set of Document Requests" (Proposed Order ¶ C); and
- "Kusher shall submit to a deposition at the offices of Deltec's counsel in Minneapolis commencing May 21, 2004, and continuing thereafter until completed" (Proposed Order ¶ E).

At oral argument, LGM's counsel represented that LGM, Kusher, and KFLP would respond to Deltec's document requests if given a few weeks. LGM's counsel also represented that Kusher would be available for a deposition in Florida. Based on these representations, the Court will grant Deltec's motion, but the Court will modify the requested date by which LGM, Kusher, and KFLP must respond to Deltec's document request and will modify the requested location and date of Kusher's deposition.

Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiff Hollywood Healthcare Corp., d/b/a LogiMedix's Motion for a Temporary Restraining Order, Preliminary Injunction and Expedited Hearing (Doc. No. 2) is DENIED;
2. Defendant Deltec, Inc.'s Motion for Temporary Restraining Order or a Preliminary Injunction and for Declaratory Relief (Doc. No. 5) and its request for the appointment of a receiver is DENIED;
3. Defendant Deltec, Inc.'s Motion for Expedited Discovery (Doc. No. 8) is GRANTED:

a. LGM, Kusher and KFLP shall produce to Deltec's counsel in Minneapolis on or before June 1, 2004, unless a later date is agreed upon by the parties, all documents responsive to Deltec's First Set of Document Requests; and

b. Kusher shall submit to a deposition at the Florida offices of his counsel or at his place of business in Florida commencing on or before June 1, 2004, on a date agreed upon by the parties, and continuing thereafter until completed.

2004 WL 1118610 (D.Minn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works