**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| UNITED HEALTHCARE INSURANCE CO. and AARP, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 01-CV-2320 JMR/FLN |
| ADVANCEPCS, | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF CLAUDE MARTIN, JR.**

STATE OF MICHIGAN )
)ss.
COUNTY OF WASHINGTON )

CLAUDE R. MARTIN, JR., being first duly sworn, on oath deposes and says:

1. My name is Claude R. Martin, Jr. I reside at 1116 Aberdeen Drive, Ann Arbor, Michigan, 48104. I am 69 years old and have personal knowledge of the facts set forth in this affidavit. If called to testify, I could competently testify to the matters set forth herein.

2. I received a Ph.D in Business Administration from Columbia University in 1969. I have been a professor at the University of Michigan since 1965 and from 1980 through the present I have been the Isadore & Leon Winkelman Professor of Marketing.

3. I have spent approximately 41 years researching, studying and evaluating patterns of consumer behavior. This includes time spent on my Ph.D dissertation on consumer behavior patterns, countless courses I have taught on the subject

EXHIBIT
tabbies
1

of consumer behavior at the University of Michigan and my membership in the Association for Consumer Research. See Curriculum Vita of Claude R. Martin Jr. attached at Tab A. I have also authored more than 70 articles appearing in national and international journals primarily addressing issues related to marketing and including articles focusing on the consumer behavior of older Americans.

4. From 1983-1989, I was on the board of directors of Perry Drugs Store Inc. Of particular concern to the board at that time were third-party payment systems and networks used to check eligibility requirements for prescription drug customers. As customers frequently were unable to present their membership cards, a pharmacy's ability to rely on computerized databases and networks was of paramount importance to the company to ensure payment was ultimately received.

5. I have reviewed the Complaint in this action, interviewed pharmacists from UnitedHealth Group and Express Claims Inc. and reviewed documents provided to me by counsel. Based on my review and my many years of experience in the field of marketing and consumer behavior, I have formed a variety of opinions with respect to this case. Specifically, AdvancePCS has created customer confusion in the retail pharmacy marketplace in three key ways : (1) by continuing to approve claims, under its new prescription discount card program, that carry the unique carrier-group numbers previously assigned to the AARP Program; (2) by providing misleading advertisements to pharmacies; and (3) by providing misleading messages to pharmacies at the point of sale.

6. According to my review of the Complaint and interviews with the Express Claims and UnitedHealth Group pharmacists ("Pharmacists"), in 1997, the

AARP launched the Member$_x$ Choice Program to make available to AARP members, among other services, a prescription drug discount card that would guarantee discounted prices on specified prescription medications at participating pharmacies. Many AARP members pay a fee, in addition to the AARP annual dues, to participate in the AARP prescription drug discount card program. In addition, AARP members who purchase certain AARP health insurance products also participate in the AARP prescription drug discount card program. For the purposes of this Affidavit, AARP members eligible for the AARP prescription drug program (the "AARP Program") will be referred to as AARP Program participants. There are approximately 3.5 million AARP Program participants.

7. I have been informed that a key component of the AARP Program is known as the Drug Utilization Review ("DUR"), a process which is intended to, among other things, prevent harmful drug interactions. The DUR is a potentially life-saving service that is provided to AARP Program participants to ensure that they do not take potentially deadly combinations or courses of drugs inadvertently.

8. Under the AARP Program, as administered by AdvancePCS, participants were given cards bearing a unique carrier-group number and a unique participant I.D. number (the "PCS Cards"), which together identified the card holder as an AARP Program participant, eligible for AARP Program discounts. Under the AARP Program, the carrier number was "H020" and the unique group numbers included, but were not limited to, 2100, 2200, 2300, 2400, and 3001-3051. AARP Program participants presented the PCS Cards to pharmacists at retail pharmacies enrolled in the AdvancePCS network ("AdvancePCS Network Pharmacist") in order to receive prescription drug discounts.

9. In mid-April 2001, AARP selected United to assume operational responsibility for its discount card program. United conducted a competitive review process, and determined that AdvancePCS' bid to continue servicing the program was not competitive. Therefore, AdvancePCS was terminated as the PBM for the AARP Program and was replaced by Express Scripts Inc. ("ESI").

10. On April 18, 2001, AdvancePCS was advised of the decision to terminate AdvancePCS as the PBM for the AARP Program. The termination was effective September 1, 2001. On that same date, AdvancePCS launched its own "open membership" prescription drug discount card program, called the "AdvancePCS Prescription Plan" (the "AdvancePCS Plan"). Based on my interviews with the Pharmacists, this new discount card program completely deviated from established industry practice in two significant ways. First, AdvancePCS adopted the same AARP Program carrier number (H020) for its own program. Second, AdvancePCS simultaneously stopped checking group numbers or participant I.D. numbers to determine eligibility for its new plan. As a result, AdvancePCS processes all claims that carry the H020 carrier number, even if the claims include one of the unique group numbers previously assigned to the AARP Program.

11. As a result of AdvancePCS' failure to reject claims carrying the unique carrier-group numbers assigned to the AARP Program, it appears that AARP members are being diverted into the AdvancePCS Plan. Based on my interviews with the Pharmacists, I believe AdvancePCS has been able to accomplish this diversion because of the way pharmacies customarily retain customer information (known as a "Patient Profile") within the industry. Under this routine industry practice, participants presented

their cards upon an initial visit to the pharmacy. Pharmacists entered the information from the card into the pharmacy's computer system, including the participant I.D. number, the carrier-group number and the BIN. This information is known as the Patient Profile. The Patient Profile was saved in the pharmacy's computer system for future prescription drug purchases by the participants. The pharmacist would normally only ask to see the participant's discount card after the initial visit if AdvancePCS refused to process a subsequent claim for that participant. Generally, pharmacists rely on PBMs to alert them to any changes relating to specific carrier-group numbers, BIN, or a participant's eligibility. Further, it is also my understanding based on my interviews with the Pharmacists, that a PBM would normally stop processing claims carrying the unique carrier-group numbers assigned to former clients. In this instance, however, AdvancePCS has chosen not to do so. Therefore, when the pharmacist seeks authorization using the Patient Profile contained in the pharmacy computer database, AdvancePCS treats the claim as if it were for a participant in the new AdvancePCS Plan.

12. Based on the information available to me, AdvancePCS has refused to cease approving claims carrying any of the unique carrier-group numbers previously assigned to the AARP Program.

13. Based on my experience and the studies I have reviewed, it is my reasoned opinion that senior citizens, as a consumer group, are particularly susceptible to confusion in the health care marketplace. Therefore, senior citizens are far more likely than the average health care consumer to be misled by the type of practices being undertaken by AdvancePCS. It is my opinion that AdvancePCS' failure to reject claims carrying unique carrier-group numbers assigned to the AARP Program has therefore led

to consumer confusion between the AdvancePCS Plan and the AARP Program, especially among senior citizens.

14. One result of the customer confusion caused by AdvancePCS is that AARP Program participants are being denied the services they expect from the AARP Program. This is important to AARP Program participants for a variety of reasons. First, they have paid for and contracted to receive AARP Program-endorsed services and are being diverted from such services without their knowledge or consent. Second, based on my experience in the field of consumer behavior, it is my opinion that when an organization elicits a membership commitment from a consumer it cements a special relationship between that consumer and the organization. Therefore, when AARP Program participants present their AARP cards they are expecting to receive the benefits they have contracted for from the organization with which they have formed a relationship. This expectation is not met as a result of the consumer confusion caused by AdvancePCS.

15. I have also reviewed the flyers sent from AdvancePCS to various pharmacies for the purpose of announcing its new AdvancePCS Plan. See Flyer attached at Tab B. The flyer, which was distributed to retail pharmacists by AdvancePCS, has exacerbated the confusion in the retail pharmacy industry already caused by AdvancePCS' use of the unique carrier-group number previously assigned to the AARP Program. Because the flyer begins with the statement "Thank you for participating in the AdvancePCS Plan" and directs pharmacists to use the H020 carrier number previously used for the AARP Program, a pharmacist who has come to know AdvancePCS as the PBM for the AARP Program is likely to believe that AdvancePCS is still the PBM for the

AARP Program when in fact it is not. While the flyer does reference the fact that AdvancePCS is no longer administering the AARP Program, this reference is relegated to the bottom of the flyer and is overshadowed by the "Thank you" message and the instruction to continue using the H020 number. It is my opinion that, taken as a whole, the flyer is likely to mislead pharmacists with regard to the source and affiliation of the advertised discount card program.

16. Also, according to my interviews with the Pharmacists, the pharmacist is not effectively advised by AdvancePCS, prior to approval of the claim, that AdvancePCS no longer administers the AARP Program. Rather, if the presenting pharmacy is part of AdvancePCS' network, AdvancePCS authorizes the pharmacist to fill the prescription as if the customer were participating in the AdvancePCS Plan. After the Patient Profile has been transmitted and after the claim has already been authorized by AdvancePCS, a brief message is displayed – in an alternate field that most pharmacists do not even view – thanking the pharmacist for transmitting the claim and stating that AdvancePCS no longer administers the AARP Program. In my experience on the board of directors for Perry Drug Stores, Inc. I became aware that pharmacists rely heavily on their computer systems when filling customer prescriptions. This view was confirmed through my interviews of the Pharmacists. Specifically, if the computer system does not return a message directing the pharmacist that there is something wrong with the claim, patient eligibility information, or other information, he or she will submit the claim for authorization using the same information contained in the pharmacy's computer database. In this case, since the system does not tell pharmacists that AdvancePCS no longer administers the AARP Program until after the pharmacy receives approval, and even then

only in an alternate field that some pharmacists do not even view, the pharmacists mistakenly send claims to AdvancePCS believing they are still administering the AARP Program. This is a prime example of confusion in the retail pharmacy market.

17. When, however, the pharmacy presenting the claim is not part of the AdvancePCS network, instead of approving the claim, AdvancePCS returns to the pharmacy the message "provider not enrolled" (or an equivalent notice). This prompts pharmacists to contact AdvancePCS for clarification. When the pharmacist contacts AdvancePCS for clarification of this message, one of AdvancePCS' sales persons attempts to enroll the pharmacy in the AdvancePCS network. If the pharmacy enrolls, the AARP Program participant's claim is processed pursuant to the AdvancePCS Plan and the AARP Program participant does not receive the AARP Program services.

18. Based on currently available information, since the transition of the AARP Program to ESI, the volume of claims processed by United has fallen by as much as 56%. Claim volume history indicates that, on average, 1 to 2 million claims were processed under the AARP Program each month by AdvancePCS prior to September 1, 2001. In August 2001, AdvancePCS processed 1,679,431 retail claims for the AARP Program. After September 1, the number of claims processed through the AARP Program dropped precipitously – to only 739,333 claims in September.

| 8/2001 Volume (PCS) | September 2001 Volume | | October 2001 Volume | | November 2001 Volume | | December 2001 Volume | |
|---|---|---|---|---|---|---|---|---|
| | United | % decrease from 8/01 | United | % decrease from 8/01 | United | % decrease from 8/01 | United | % decrease from 8/01 |
| 1,679,431 | 739,333 | 56% | 983,443 | 41% | 1,005,041 | 40% | 1,009,257 | 40% |

Claim volume has dropped by over 40% from the number of claims typically processed on a monthly basis through the AARP Program.

19. The sudden loss of over 40% of United's claim volume highlights the customer confusion resulting from AdvancePCS' continuing approval of claims using the unique carrier-group numbers previously assigned to the AARP Program. The fact that the decrease in claim volume has persisted since the transfer further demonstrates the disruption and confusion caused by AdvancePCS. Based on my years of studying and analyzing consumer behavior, it is my reasoned opinion that there is no other business explanation for a loss in claim volume of this magnitude, where AARP Program participants have contracted and paid for this benefit, other than the confusion caused by AdvancePCS.

20. The actions of AdvancePCS will cause harm to AARP. Based on my years of experience studying consumer behavior, as members begin to discover they are not receiving the benefits they contracted for from AARP, primarily the protection of the DUR system, they will mistakenly blame AARP. This damage to AARP's reputation will be multiplied each time a disappointed member relays this tale to others.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Claude R. Martin, Jr.

SUBSCRIBED AND SWORN TO before me this 3rd day of January, 2002

Notary Public

SHASANK G. PATEL
My Commission Exp. 03/08/05

My commission expires: